RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0171p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　　　　　　*Plaintiff-Appellee,*

　　*v.*

ANTONIO RIOS (14-2495); DAVID CASILLAS (14-2512),

　　　　　　　　　　*Defendants-Appellants.*

Nos. 14-2495/2512

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:12-cr-00132—Robert Holmes Bell, District Judge.

Argued:  January 14, 2016

Decided and Filed:  July 21, 2016

Before:  SUHRHEINRICH and MOORE, Circuit Judges; LUDINGTON, District Judge.[*]

_____

## COUNSEL

**ARGUED:**  Scott Graham, SCOTT GRAHAM PLLC, Portage, Michigan, for Appellant in 14-2495.  Mary Chartier, ALANE & CHARTIER, P.L.C., Lansing, Michigan, for Appellant in 14-2512.  Sally J. Berens, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.  **ON BRIEF:**  Scott Graham, SCOTT GRAHAM PLLC, Portage, Michigan, for Appellant in 14-2495.  Mary Chartier, ALANE & CHARTIER, P.L.C., Lansing, Michigan, for Appellant in 14-2512.  Sally J. Berens, Russell A. Kavalhuna, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

---

[*]The Honorable Thomas L. Ludington, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge. Antonio Rios and David Casillas were charged along with twenty-nine co-defendants in a sprawling racketeering indictment charging that they were involved in the criminal activities of the Holland, Michigan chapter of the organization known as the Latin Kings. Rios and Casillas were the only ones to go to trial—the others pleaded guilty and were sentenced, and we recently resolved the appeals of nine co-defendants who challenged the sentences they received. *See United States v. Penaloza*, Nos. 14-1360, 14-1600, 14-1717, 14-1804, 14-1839, 14-1986, 14-2094, 14-2129, 14-2249, 2016 WL 2755180, ___ F. App'x ___ (6th Cir. May 12, 2016). The case against Rios and Casillas focused on a racketeering-conspiracy charge ("Count One") under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, which alleged that the Holland Latin Kings was a racketeering enterprise that "was and is overseen by, has always had connections to, and received directions from, the Chicago Heights, Illinois (21st and Wenworth) Latin Kings." R. 480 (Fourth Superseding Indictment at 5) (Page ID #2142). Count One alleged the commission of 129 overt acts in furtherance of the twenty-year-long racketeering conspiracy, and also contained eleven special sentencing allegations, charging various defendants with conspiring to distribute five kilograms or more of cocaine between 1993 and 2013, and the commission of ten assaults with the intent to commit murder. *Id.* at 15–37 (Page ID #2152–74). Rios and Casillas were each charged in Count One and its special sentencing allegation regarding the distribution of cocaine, and Rios was additionally charged with three of the assaults with the intent to commit murder. *See id.* at 3, 33–36 (Page ID #2140, 2170–73). Count Fourteen—with which Rios and Casillas were charged—alleged a conspiracy to possess with the intent to distribute five kilograms or more of cocaine between 2006 and 2012. *See id.* at 54–55 (Page ID #2191–92). Count Fifteen—with which Rios was charged, but Casillas was not—alleged a conspiracy to possess with the intent to distribute one-hundred kilograms or more of marijuana between 2009 and 2012. *See id.* at 56 (Page ID #2193).

Rios and Casillas proceeded to trial on June 2, 2014. The evidence presented was extensive, and we review many facets of it in detail in connection with our assessment of the various legal arguments presented by Rios and Casillas. In summary, three initial witnesses painted a picture of the national Latin Kings organization and how the Holland Latin Kings fit into its structure and practices. Much of the rest of the trial consisted of testimony, largely from cooperating co-defendants, corroborating aspects of the testimony regarding the Holland Latin Kings, and setting forth details about a number of specific criminal acts that the government claimed had been committed in furtherance of the racketeering conspiracy. On June 13, 2014, the jury found Rios and Casillas guilty of Count One, the RICO conspiracy, and Count Fourteen, the cocaine conspiracy. *See* R. 1197 (Verdict Form at 1–3) (Page ID #13777–79). The jury also found Rios and Casillas responsible for the Count One special sentencing allegation related to the distribution of five kilograms or more of cocaine between 1993 and 2013. *See id.* at 1–2 (Page ID #13777–78). The jury acquitted Rios of Count Fifteen, the marijuana-distribution conspiracy, as well as the special sentencing allegations regarding assault with the intent to commit murder. *See id.* at 1–3 (Page ID #13777–79).

Rios was later sentenced to concurrent terms of 240 months on Count One and 300 months on Count Fourteen, with 61 months of credit "for gang-related discharged terms of imprisonment," R. 1396 (Rios Judgment at 2) (Page ID #20861), and Casillas was sentenced to concurrent terms of 200 months on Count One and 360 months on Count Fourteen, with 148 months of credit "for gang-related discharged terms of imprisonment," R. 1397 (Casillas Judgment at 2) (Page ID #20867). On appeal, they each raise issue with many aspects of the trial, as well as the sentences they received. For the reasons that follow, we **AFFIRM** Rios's conviction and sentence, and **AFFIRM** Casillas's conviction and sentence.

## I.  ANALYSIS – TRIAL ISSUES

### A.  Appropriateness of Expert Testimony

The government proposed pretrial that it would utilize two expert witnesses. Keith Bevacqui would serve as an expert "regarding the Latin Kings national organization," R. 912 (Gov't's Suppl. Response to Expert Mot. at 3) (Page ID #6840), and Detective Kristopher

Haglund—who had also served as a lead investigator in this case—would provide expert testimony regarding "the unique attributes of the Holland chapter of the Latin Kings" and "as to who, in his opinion, is a member of the Holland Latin Kings," R. 895 (Gov't's Initial Response to Expert Mot. at 2) (Page ID #6442). The defendants sought to exclude both witnesses, arguing that Bevacqui could not "reliably apply his principles and methods to the facts of this case," R. 954 (Defs.' Suppl. Expert Mot. at 2) (Page ID #8760), while Haglund lacked a reliable methodology, would be testifying to matters that would be covered by fact witnesses, and would confuse the jury by virtue of his dual role as both fact and expert witness, R. 845 (Defs.' Expert Mot.) (Page ID #5452–66). The district court denied both requests. *See* R. 1064 (April 18, 2014 Opinion) (Page ID #11477–87). Both witnesses testified as experts at trial, with Bevacqui focusing on the structure, norms, and operations of the Almighty Latin King Nation, and Haglund linking that testimony to similar practices by the Holland Latin Kings. Haglund also testified to the Holland Latin Kings's drug-trafficking activities, and its use of violence to protect those activities, its members, and its territory.

On appeal, Rios and Casillas raise a number of arguments regarding this testimony. Both argue that Bevacqui's testimony was irrelevant and unreliable because Bevacqui knew nothing about the Holland Latin Kings. Rios also contests Haglund's testimony, arguing that it served only to impart "his opinion that the Defendants who went to trial were guilty" and that he "mixed fact and expert testimony together." Rios Appellant Br. at 29–30. Relatedly, Rios and Casillas rely extensively on a portion of the Second Circuit's decision in *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), that discussed the proper scope of gang-expert testimony under Rule 702. Before analyzing these interrelated arguments, we set forth the law regarding the use of expert witnesses on gangs and discuss the many pitfalls that attend to the use of such witnesses.

**1. Law Governing the Use of Gang-Expert Witnesses.**

Like all experts, the role of gang-expert witnesses is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Although Rule 702 commonly applies to scientific expert testimony, it applies equally to witnesses whose expertise stems from other types of specialized knowledge, granting the district court "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," provided that the gatekeeping mandate of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), is followed "to ensure the reliability and relevancy of expert testimony," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  The Rule 702 analysis proceeds in three stages:  "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.'  Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'  Third, the testimony must be reliable."  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed. R. Evid. 702), *cert. denied*, 556 U.S. 1152 (2009).  "We review for abuse of discretion the district court's determination to admit or exclude expert testimony."  *Id.* at 528.

To determine whether an expert's testimony will be relevant, we look to "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."  Fed. R. Evid. 702, Adv. Comm. Notes (quoting Mason Ladd, *Expert Testimony*, 5 VAND. L. REV. 414, 418 (1952)).  Accordingly, "[a] district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror." *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir.), *cert. denied*, 513 U.S. 932 (1994).

In cases involving law-enforcement experts, we have interpreted this to mean that the district court, in performing its gatekeeping role, must assess whether, "without expert testimony,

the average juror is unlikely to understand" the material about which the expert proposes to testify. *See United States v. Thomas*, 74 F.3d 676, 682 (6th Cir.), *cert. denied*, 517 U.S. 1162 (1996), *abrogated on other grounds by Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 515 (6th Cir. 1998). Law-enforcement expertise is therefore relevant when it imparts "evidence regarding the inner-workings of organized crime[, which] has been held to be a proper subject of expert opinion because such matters are 'generally beyond the understanding of the average layman.'" *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000) (quoting *Thomas*, 74 F.3d at 682). For example, an FBI Agent in a case about organized crime may properly give expert testimony "on the structure, the organization, [and] the rules" of the organized-crime entity. *Id.* at 418 (internal quotation marks omitted). Nor are we alone in condoning the use of such experts in prosecutions involving criminal organizations. *See, e.g., United States v. Kamahele*, 748 F.3d 984, 998 (10th Cir. 2014) (gang-expert testimony was helpful to the jury where expert would provide "expertise about [the gang's] structure, insignia and history," "[a]nd the district court could have assumed that a typical juror would lack knowledge of the gang terminology and the significance of [the] insignia"). Given the variation in practices among different gangs, a gang expert's testimony on these relevant subjects is *reliable* only insofar as it is based on significant experience with the gang about which the expert is testifying. *See, e.g., United States v. Norwood*, 16 F. Supp. 3d 848, 861–62 (E.D. Mich. 2014) (noting that gang expertise "usually arises from the officer's significant experience investigating a particular gang" and concluding that a proffered expert would be unreliable because the expert had not been involved with the specific gang at issue, or even the geographic region).

This straightforward theory of gang-expert testimony does not always play out in practice. "An increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence." *Mejia*, 545 F.3d at 190. District courts must therefore remain vigilant to ensure that *all* of a law-enforcement expert's testimony relates to issues that are "beyond the ken of the average juror." *Amuso*, 21 F.3d at 1263. Otherwise,

> [i]f the officer expert strays beyond the bounds of appropriately 'expert' matters, that officer becomes, rather than a sociologist describing the inner workings of a

closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt. As the officer's purported expertise narrows from 'organized crime' to 'this particular gang,' from the meaning of 'capo' to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them. The officer expert transforms into the hub of the case, displacing the jury by connecting and combining all other testimony and physical evidence into a coherent, discernible, internally consistent picture of the defendant's guilt.

*Mejia*, 545 F.3d at 190–91.

A related issue arises when the law-enforcement expert is also a fact witness in the case. This creates a "'significant risk that the jury will be confused by the officer's dual role,'" although we have refused "to adopt a *per se* prohibition of the practice." *Tocco*, 200 F.3d at 418 (quoting *Thomas*, 74 F.3d at 682–83). One concern is "that a case agent who testifies as an expert receives 'unmerited credibility' for lay testimony." *United States v. Freeman*, 498 F.3d 893, 903 (9th Cir. 2007) (quoting *United States v. Dukagjini*, 326 F.3d 45, 53 (2d Cir. 2003)). Alternatively, "the witness's dual role might confuse the jury," or "'the jury may unduly credit the opinion testimony of an investigating officer based on a perception that the expert was privy to facts about the defendant not presented at trial.'" *United States v. York*, 572 F.3d 415, 425 (7th Cir. 2009) (quoting *United States v. Upton*, 512 F.3d 394, 401 (7th Cir. 2008)). To assuage these concerns, we have suggested that "the district court and the prosecutor take care to assure that the jury is informed of the dual roles of a law enforcement officer as a fact witness and an expert witness." *Tocco*, 200 F.3d at 418 (agent's "dual roles were emphasized to the jury by the fact that he testified at two different times" and "the district court instructed the jury, both before he gave his opinion and again in the jury charge, that it should consider [the agent's] dual roles in determining what weight, if any, to give [the] expert testimony").

## 2. Bevacqui's Testimony Was Relevant and Reliable.

This framework is easily applied to Bevacqui's expert testimony. The substance of the defendants' attack on Bevacqui is that his knowledge about the national Latin Kings does not bear on the Holland Latin Kings, making it irrelevant and unreliable in this case. To be sure,

Bevacqui admitted that "[t]he first time that I heard about the Holland Latin Kings was through [a] telephone call" from the U.S. Attorney's Office regarding this case. R. 936 (Tr. of Bevacqui Hearing at 22:9–21) (Page ID #7735). Thus, he would not have been a reliable expert on the *Holland* Latin Kings. *See Norwood*, 16 F. Supp. 3d at 862 ("expert testimony has been rejected when the proposed expert witness lacked relevant experience with a particular group"). But Bevacqui did not purport to give opinion testimony about the Holland Latin Kings. Rather, he opined about the nationwide Latin Kings, and the government sought to make the link to the Holland Latin Kings through other testimony. In light of other testimony linking the Holland Latin Kings to the national organization, and showing that the Holland Latin Kings shared with the national organization many of the characteristics Bevacqui discussed, Bevacqui's testimony was appropriate "evidence regarding the inner-workings of organized crime," *Tocco*, 200 F.3d at 419, including testimony similar to that we approved in *Tocco* regarding "the structure, the organization, the rules, the interpretation of phrases, and jargon that's been used in [the] trial," *id.* at 418.[1]

### 3. Haglund Improperly Mixed Fact and Expert Testimony, and May Have Testified Outside the Scope of Rule 702.

The application of the gang-expert legal framework is more complex with respect to Detective Haglund. Haglund's testimony was largely either within the appropriate scope of gang-expert testimony, as it focused on the traditional areas in which a gang expert can testify—history, organization, and unique terminology or symbols—or involved him testifying to specific facts and events he personally witnessed. But Haglund strayed into testimony that is potentially problematic when he testified about specific criminal actions, including: (1) drug dealing by the Holland Latin Kings and, for example, his estimate that it was "a common thing for members to do," R. 1233 (Trial Tr. Vol. 2 at 323:8–324:19) (Page ID #14467–68); (2) how the Holland Latin Kings obtained and utilized "nation guns," *id.* at 329:4–330:2 (Page ID

---

[1]The defendants' other arguments on this issue go only to the weight, not the admissibility, of Bevacqui's testimony. *See* Rios Appellant Br. at 24 (noting that much of Bevacqui's knowledge came from work in New Jersey); Casillas Appellant Br. at 20 (discussing trial testimony that purportedly demonstrated that the link between the national Latin Kings and the Holland Latin Kings was weak). We must always take care not to "confuse[] the *credibility and accuracy* of [an expert's] opinion with its *reliability*"; "a determination that proffered expert testimony is reliable does not indicate, in any way, the correctness or truthfulness of such an opinion." *In re Scrap Metal*, 527 F.3d at 529 (emphasis in original).

#14473–74); (3) his "experience" that the Holland Latin Kings commonly engage in violent disputes with other gangs, *id.* at 298:3–13 (Page ID #14442); and (4) the use of violence against those who steal drugs from the Holland Latin Kings, *id.* at 324:20–24 (Page ID #14468). Much of that information is well within the average juror's ability to understand, making expert testimony unnecessary. *See, e.g.*, *United States v. Garcia*, 793 F.3d 1194, 1213 (10th Cir. 2015) ("[T]here is no sociological expertise in testifying to gang members' specific travels, specific uses of gang funds, or commission of specific crimes."), *cert. denied*, 136 S. Ct. 860 (2016). Using an expert to convey that information ran the risk that Detective Haglund would "transform[] into the hub of the case, displacing the jury by connecting and combining all other testimony and physical evidence into a coherent, discernible, internally consistent picture of the defendant's guilt." *Mejia*, 545 F.3d at 190–91.

These aspects of Haglund's testimony may have been proper if they were given in Detective Haglund's capacity as a fact witness, based upon his actual experience with the investigation. If an expert also gives fact-witness testimony, his relaying of information that exceeds the scope of Rule 702 is not problematic *if done in his capacity as a fact witness. See id.* at 196 (recognizing that an officer giving facts he personally investigated and separate expert opinions would not exceed the scope of Rule 702). In this case, it is difficult to parse what came from Haglund the expert and what came from Haglund the investigator because there was no clear demarcation between his fact and expert testimony during the trial.

This confusion regarding the capacity in which Haglund was testifying is independently problematic. The district court did not delineate Detective Haglund's testimony—and Haglund himself never distinguished between his fact and expert testimony. Haglund testified twice during the trial, but the bulk of his testimony came the first time (the second time, Haglund testified solely about his involvement with a January 2011 traffic stop of Rios). Haglund's main testimony touched on all aspects of the Holland Latin Kings's structure, organization, history, and symbols, but also discussed more specific events, some but not all of which he appears to have witnessed directly. This was problematic because "[s]eamlessly switching back-and-forth between expert and fact testimony does little to stem the risks associated with dual-role witnesses." *York*, 572 F.3d at 426. The district court did not clarify the situation when

instructing the jury, stating only: "You've heard the testimony of Kris Haglund from the Holland Police Department who testified both as a fact and as an opinion witness. Each of these type of testimonies should be given the proper weight." R. 1274 (Trial Tr. Vol. 9 at 2147:12–24) (Page ID #17711). Nor did anyone explain that the jury could consider Haglund's status as a key fact witness for the government in evaluating the credibility of his expert testimony. Accordingly, even if Haglund's testimony did not exceed the scope of Rule 702, his overall presentation as a dual fact-expert witness without further demarcation or explanation to the jury was in error.

### 4. The Admission of Haglund's Testimony Was Harmless.

Any error—either the admission of some expert testimony that exceeded the scope of Rule 702 or the confusing mixing of Haglund's expert and fact testimony—was harmless. Although Haglund formed a key part of the introductory portion of the trial, much of his testimony was separately confirmed by witnesses who testified to the same or very similar facts. This was true of the testimony regarding specific criminal actions,[2] as well as much of Haglund's overall discussion of the history, structure, and operations of the Holland Latin Kings.[3] Accordingly, we cannot say on these specific facts that "it is more probable than not that the

---

[2]Witnesses testified to the overall use of violence and drug distribution by the Holland Latin Kings, *see, e.g.*, R. 1233 (Trial Tr. Vol. 2 at 447:6–448:17, 457:13–458:7) (Page ID #14591–92, 14601–02), as well as the following particulars: (1) the use of nation guns by the Holland Latin Kings, *id.* at 456:20–457:12, 458:8–459:13 (Page ID #14600–03); (2) various specific acts of violence, including those related to drug dealing, R. 1236 (Trial Tr. Vol. 5 at 1129:7–1132:1, 1325:17–1329:1, 1349:16–1364:14) (Page ID #15278–81, 15474–78, 15498–15513); R. 1271 (Trial Tr. Vol. 6 at 1418:19–1420:16) (Page ID #16976–78); R. 1272 (Trial Tr. Vol. 7 at 1573:21–1578:5, 1603:12–1606:18, 1612:20–1613:25, 1756:25–1759:12) (Page ID #17133–38, 17163–66, 17172–73, 17316–19); and (3) the process by which the Holland Latin Kings distributed drugs, R. 1233 (Trial Tr. Vol. 2 at 462:14–22) (Page ID #14606); R. 1235 (Trial Tr. Vol. 4 at 892:21–904:25) (Page ID #15039–51); R. 1271 (Trial Tr. Vol. 6 at 1420:22–1457:10, 1507:10–1509:18) (Page ID #16978–17015, 17065–67); R. 1272 (Trial Tr. Vol. 7 at 1721:15–1726:19 (Page ID #17281–86).

[3]This included corroboration regarding: (1) the structure of the Holland Latin Kings, R. 1233 (Trial Tr. Vol. 2 at 467:22–468:16 (Page ID #14611–12); (2) the specific roles that Rios and Casillas played within the Holland Latin Kings, *id.* at 474:2–5 (Page ID #14618); R. 1234 (Trial Tr. Vol. 3 at 770:21–771:1) (Page ID #14915–16); R. 1235 (Trial Tr. Vol. 4 at 788:9–20) (Page ID #14935); (3) the symbols, colors, and sayings utilized by the Holland Latin Kings, R. 1233 (Trial Tr. Vol. 2 at 455:23–456:12) (Page ID #14599–600); R. 1234 (Trial Tr. Vol. 3 at 570:20–571:4) (Page ID #14715–16); R. 1236 (Trial Tr. Vol. 5 at 1224:23–1225:3) (Page ID #15373–74); and (4) the ties between the Holland Latin Kings and the national organization, R. 1234 (Trial Tr. Vol. 3 at 512:2–526:12) (Page ID #14657–71); R. 1235 (Trial Tr. Vol. 4 at 776:22–777:6) (Page ID #14923–24).

error materially affected the verdict." *United States v. Pritchett*, 749 F.3d 417, 433 (6th Cir.) (internal quotation marks omitted), *cert. denied*, 135 S. Ct. 196 (2014).

**B. Confrontation Clause**

Rios and Casillas also argue that Bevacqui and Haglund based portions of their expert testimony on hearsay in violation of the Confrontation Clause of the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Supreme Court has interpreted the Clause to bar "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). The Clause is in some tension with Federal Rule of Evidence 703, which permits an expert witness to base an opinion on inadmissible evidence "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."

This conflict is not insurmountable. "[T]he Rule and the Clause can be reconciled if the expert exercises 'independent judgment' in assessing and using the hearsay (and other sources) to reach an expert opinion." *Garcia*, 793 F.3d at 1212 (quoting *Kamahele*, 748 F.3d at 1000). In general, then, "[a]n expert witness's reliance on evidence that *Crawford* would bar if offered directly only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation." *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009). With law-enforcement experts, this line can be difficult to draw because they base their opinions on their experience, which often includes the interrogation of suspects and discussions with cooperating witnesses. When an expert's understanding of the inner workings of a criminal organization stems in significant part from such activities, courts have agreed that it is the process of amalgamating the potentially testimonial statements to inform an expert opinion that separates an admissible opinion from an inadmissible transmission of testimonial statements. "If an expert simply parrots another individual's out-of-court statement, rather than conveying an independent judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion, then the expert is, in effect, disclosing that out-of-court

statement for its substantive truth." *United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012); *see also Kamahele*, 748 F.3d at 1000 (phrasing the inquiry as whether the expert "simply parroted a testimonial fact learned from a particular interview"); *United States v. Palacios*, 677 F.3d 234, 243 (4th Cir.) (gang expert's testimony did not violate *Crawford*, even though the expert's views were based in part on discussions with other officers and interviews with gang members and victims, because the expert's testimony "did not specifically reference any of these interviews"), *cert. denied*, 133 S. Ct. 124 (2012). That is not to say that a law-enforcement expert may simply avoid quoting a testimonial statement or identifying its source. In *Mejia*, for example, the Second Circuit drew the line at gang-expert testimony that discussed specific facts about the gang at issue when the expert had learned the information from interviews. 545 F.3d at 198; *see also Garcia*, 793 F.3d at 1213 ("An important consideration in distinguishing proper testimony from parroting is the generality or specificity of the expert testimony."). Thus, the Confrontation Clause is concerned with the use of experts to transmit particular testimonial statements, or their specific substance, to the jury.[4]

Although Rios and Casillas assert that Bevacqui based his opinions in part on testimonial hearsay statements, they do not cite examples of the transmission of particular testimonial statements, noting only that Bevacqui must have based his expert opinion on testimonial statements. *See* Rios Appellant Br. at 30–31; Casillas Reply Br. at 4. As discussed, however, merely basing an expert opinion on testimonial statements is not problematic. The defendants are more specific with regard to Detective Haglund, Rios Appellant Br. at 30–31; Casillas Appellant Br. at 27, and the trial record makes clear that Haglund's expert opinion was influenced by hearsay in three ways: First, in discussing his history of investigating gangs in Holland, Detective Haglund testified that he "spoke to a lot of informants in an attempt to kind of understand what was going on in our community at the time," and admitted to having "listen[ed] to jail conversations," "read jail letters," and "[i]nterview[ed] people." R. 1233 (Trial Tr. Vol. 2 at 290:4–15) (Page ID #14434). Second, in discussing the "beating-out process"—when Latin

---

[4]*United States v. Reyes*, 18 F.3d 65 (2d Cir. 1994), and *Washington v. McDaniel*, 230 P.3d 245 (Wash. Ct. App. 2010), *rev. denied*, 241 P.3d 413 (Wash. 2010), are not to the contrary. *Reyes* involved a law-enforcement officer who was testifying as a fact witness and relayed a specific hearsay statement. 18 F.3d at 67, 69. *McDaniel* involved a situation akin to that described in *Mejia*, in which specific facts were transmitted that were based entirely on a hearsay statement. 230 P.3d at 255–57.

King members physically beat a member who has chosen to leave the gang—Haglund indicated that he had "interviewed and seen people who went through that beating-out process." *Id.* at 315:16–18 (Page ID #14459). Third, while describing the lengths to which Latin Kings go to protect their meetings from surveillance, Detective Haglund talked about having "witness[ed] via video and audio recording a meeting in which strip-searches were done [of attendees]." *Id.* at 321:2–11 (Page ID #14465).

Detective Haglund's mention of investigating gangs by interviewing various people, listening to jail conversations, and reading letters from jail likely involves potentially testimonial statements only insofar as the interviews are concerned. *See Ohio v. Clark*, 135 S. Ct. 2173, 2182 (2015) ("Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial."). For similar reasons, Detective Haglund's viewing of surveillance of a Holland Latin Kings meeting likely does not pertain to a testimonial statement. Furthermore, Detective Haglund's general reliance on interviews or other forms of testimonial statements to form his opinions does not itself violate the Confrontation Clause, which asks only whether he transmitted those statements or their specific substance to the jury.

The sole testimony cited by the defendants that may have done so was Detective Haglund's relaying of the "beating-out process" based upon interviewing Latin Kings about it. He was asked whether he had interviewed someone who went through the process and then explained: "He was taken to a different location from where they were at originally and was beaten by several Latin Kings throughout the face, the body, and suffered injuries." R. 1233 (Trial Tr. Vol. 2 at 315:22–24) (Page ID #14459). This implied directly that a specific individual told Detective Haglund about a specific event, and that Detective Haglund's account of what occurred was based upon this individual's statement. This testimony violated the Confrontation Clause, but the violation was harmless because Mario Herrera testified about the severity of the same process. *See id.* at 453:23–455:2 (Page ID #14597–99). Although Haglund was discussing a particular incident, while Herrera's testimony was more general, Haglund shared few details of the specific incident that differed from Herrera's more general discussion.

**C. Vargas's Testimony Was Relevant**

Rios argues that the testimony of Alexander Vargas—a former senior leader of the national Latin Kings—was irrelevant because it related only to Vargas's activities with the Latin Kings in Chicago. Rios does not point to a motion or objection made before the district court to exclude the entirety of Vargas's testimony, so we may review only for plain error. *See United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc), *cert. denied*, 555 U.S. 816 (2008). Rios relies on Rule 403, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Vargas's testimony discussed the history, organization, symbols, and activities of the nationwide Latin Kings organization. Vargas painted a picture of the operations of the national Latin Kings, its links to local chapters, and the various symbols, methods, and organizational details of the operation, which other witnesses then linked to the Holland Latin Kings. Vargas also testified to some direct linkages between the national Latin Kings and Latin Kings in Michigan. *See* R. 1232 (Trial Tr. Vol. 1 at 195:18–197:10) (Page ID #14337–39) (describing how Vargas was once responsible for overseeing a region of Latin Kings that included Michigan and that cocaine was then being sent to Michigan from Chicago, and also discussing a subsequent reorganization of the Michigan-area Latin Kings); R. 1233 (Trial Tr. Vol. 2 at 226:25–232:1) (Page ID #14370–76) (discussing a time when another senior leader of the Latin Kings went to Michigan to "appoint[] the leadership for Michigan," as well as an incident when Michigan Latin Kings assisted in organizing a Latin Kings chapter in Iowa). This testimony was probative in a manner similar to that of Bevacqui: It helped prove the Indictment's charge that "[t]he Holland Chapter of the Latin Kings . . . was and is overseen by, has always had connections to, and received directions from, the Chicago Heights, Illinois . . . Latin Kings." R. 480 (Fourth Superseding Indictment at 5) (Page ID #2142). Vargas's interactions with Michigan Latin Kings provided the added benefit of supplying a basis for the jury to apply directly his knowledge of the national organization to the Latin Kings in Michigan. Nor was Vargas's testimony unduly prejudicial. Although he described the Latin Kings's drug-related and violent

activities, those activities were largely similar to the types of acts that were discussed in detail involving the Holland Latin Kings.

**D. Gang-Tattoo Evidence**

At trial, the government relied heavily on gang-tattoo evidence to link members of the Holland Latin Kings to each other.  Evidence was introduced regarding the kinds of tattoos that Latin Kings throughout the country generally get, R. 1232 (Trial Tr. Vol. 1 at 160:3–14, 198:15–199:6) (Page ID #14302, 14340–41), as well as the particular tattoos that various members of the Holland Latin Kings had, R. 1233 (Trial Tr. Vol. 2 at 331:8–18, 350:1–352:13, 354:1–358:3, 359:16–360:25, 455:23–456:12) (Page ID #14475, 14494–96, 14498–14504, 14599–600); R. 1236 (Trial Tr. Vol. 5 at 1224:23–1225:3) (Page ID #15373–74).  Finally, evidence was admitted of the tattoos that Rios and Casillas have.  *See* R. 1233 (Trial Tr. Vol. 2 at 366:20–371:3, 377:10–381:1) (Page ID #14510–15, 14521–26).  Most prominently, evidence showed that Rios had an intricate tattoo on his left bicep, which displayed a scale similar to the scales of justice.  *See id.* at 382:2–11 (Page ID #14526).  On the lighter side of the scale was depicted "a cross and a book and . . . a rosary," while the heavier side had a gun, "a bag with a dollar sign on it," and packages that Detective Haglund testified appeared to be similar in appearance to bricks of marijuana or cocaine.  *Id.* at 382:12–383:9 (Page ID #14526–27).

Rios and Casillas moved pretrial to exclude the tattoo evidence.  See R. 840 (Rios Mot. to Exclude Tattoos) (Page ID # 5432–35); R. 841 (Casillas Mot. to Exclude Tattoos) (Page ID #5436–37).  The district court denied the motions, finding that the tattoos could be probative of affiliation with the Holland Latin Kings.  See R. 881 (Jan. 16, 2014 Opinion at 2–3) (Page ID #6088–89).  On appeal, Rios and Casillas contend that this evidence is irrelevant and unfairly prejudicial under Federal Rule of Evidence 403, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  We review for abuse of discretion.  *See United States v. Boyd*, 640 F.3d 657, 667 (6th Cir.), *cert. denied*, 132 S. Ct. 271 (2011).

Gang-affiliation evidence may be highly probative of an individual's membership in a particular gang, so it "has been held admissible, in cases where the interrelationship between people is a central issue." *United States v. Gibbs*, 182 F.3d 408, 430 (6th Cir.) (quoting *United States v. Thomas*, 86 F.3d 647, 652 (7th Cir. 1996)), *cert. denied*, 528 U.S. 1051 (1999). Where other evidence suggests that members of a particular gang tend to have unique tattoos, gang-tattoo evidence helps to identify an individual as a member. *See United States v. Ford*, 761 F.3d 641, 649 (6th Cir.) (gang-tattoo evidence "is relevant because it demonstrates the relationship amongst the co-conspirators"), *cert. denied*, 135 S. Ct. 771 (2014); *United States v. Alviar*, 573 F.3d 526, 538 (7th Cir. 2009) ("the evidence of Latin King handshakes, symbols, colors, and tattoos tended to establish gang membership or affiliation, and it was proper for the government to prove gang membership as part of the conspiracy"), *cert. denied*, 559 U.S. 916 (2010).

When the existence of a conspiracy or racketeering enterprise is not charged, however, the probative value of gang-membership evidence is often quite low. *See, e.g., United States v. Irvin*, 87 F.3d 860, 864 (7th Cir.) (evidence that two defendants in a drug-distribution case were members of the same gang was irrelevant when the defendants were not charged with a conspiracy because it was "not especially probative of whether they jointly ventured to distribute drugs, unless the motorcycle club is shown to be involved with drugs."), *cert. denied*, 519 U.S. 903 (1996). And there is a "substantial risk of unfair prejudice attached to gang affiliation evidence," for "[g]angs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior." *Id.* at 864–65. Thus, we held that the probative value of a gang-related tattoo depicting firearms was substantially outweighed by its prejudicial effect in a prosecution for unlawful possession of a firearm because, "[s]imply put, the fact that [the defendant] had a tattoo of a gun-wielding man or the words 'thug life' on his arm did not make it any more likely that he possessed the particular gun charged in the indictment on the day in question." *United States v. Newsom*, 452 F.3d 593, 603 (6th Cir. 2006); *see also United States v. Thomas*, 321 F.3d 627, 631 (7th Cir. 2003) (where the government had introduced evidence of a defendant's tattoo of "two revolvers," the Seventh Circuit "fail[ed] to see how the . . . tattoo was admitted for any purpose other than to establish [the defendant']s propensity to possess guns").

The vast majority of the tattoo evidence that was introduced in this case was garden-variety gang-membership evidence used to prove the affiliation of individuals with a charged racketeering conspiracy. Evidence demonstrated the types of symbols and sayings that were important to the Latin Kings and nearly all of the tattoos that were discussed at trial were of those symbols or sayings. This evidence was highly relevant because the case involved a RICO conspiracy charge, so the government was required to prove both the existence of a racketeering enterprise and each defendant's association with that enterprise. *See* 18 U.S.C. § 1962(c)–(d).[5]

A much closer issue is raised by Rios's "scale tattoo," which appears to depict Christian religious symbols on a scale being outweighed by money, a handgun, and a "brick" of narcotics, R. 1233 (Trial Tr. Vol. 2 at 382:2–383:9) (Page ID #14526–27), and was never linked to Latin Kings membership. The government emphasized the tattoo during its closing argument:

> Mr. Rios will tell you why he is guilty of this crime. Look at his arm. These are scales, folks, that Mr. Rios has emblaz[o]ned on the inside of his arm. You see religious connotation on the left, and they're a little light and the scale is tired. It's worn out. It's got a skull on the top. And then what is heavy? What is winning the battle? Guns, drugs, money. That's how you know Antonio Rios is telling you he's guilty.

R. 1274 (Trial Tr. Vol. 9 at 2030:17–25) (Page ID #17594). On appeal, the government argues that Rios's tattoo showed "that Rios had competing interests in his life, and the criminal aspects were most important." Appellee Br. at 47.

The government therefore treats the tattoo as expressive conduct—an admission by Rios that guns, drugs, and money are more important to him than religion. In that sense, the tattoo is more strongly linked to the charged activity—a racketeering conspiracy that itself engaged in gun crime and drug dealing. This can be a permissible use of tattoo evidence, as a recent decision from the Second Circuit instructs. In *United States v. Pierce*, 785 F.3d 832 (2d Cir.), *cert. denied*, 136 S. Ct. 172 (2015), the government introduced evidence that a defendant had a number of gang tattoos, including one depicting the phrase "Y.G.K.," which evidence showed stood for "Young Gunnaz Killer"—the "Young Gunnaz" being a rival gang, *id.* at 840. The

---

[5]The fact that the defendants did not contest their membership in the Holland Latin Kings is irrelevant because "the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away." *Old Chief v. United States*, 519 U.S. 172, 189 (1997).

government introduced this tattoo through photographs of the defendant "pointing a gun at his Y.G.K. tattoo," which the government argued "indicat[ed] . . . his desire to harm members of the Young Gunnaz." *Id.* The Second Circuit found the tattoo admissible "to help establish [the defendant's] motive for violence against the Young Gunnaz." *Id.* at 841. Thus, gang-tattoo evidence can serve a purpose other than proving the affiliation between individuals, when it functions as a potential admission by the individual.

We view Rios's tattoo along similar lines, although we find the inference weaker. The tattoo depicts a scale being weighed down by a firearm, drugs, and money. Thus, the message could be that guns, drugs, and money were occupying a central role in Rios's life. Such an "admission" is relatively broad when compared to an admission of a specific fact underlying the charged crime, so this is not nearly as probative as a photograph of a defendant pointing a gun at a tattoo that labels him a "Young Gunnaz Killer" in a prosecution that involved, among other things, violence against the Young Gunnaz. The potential for unfair prejudice in the form of a propensity inference also remains quite high as the tattoo is an elaborate depiction of firearms and drugs. We therefore hold that the scale tattoo was improperly admitted under Rule 403.[6]

As the government contends, however, the error was harmless because we cannot say that "it is more probable than not that the error materially affected the verdict." *Pritchett*, 749 F.3d at 433. Rios's tattoo was a relatively small piece of the case. To be sure, the government mentioned it during its closing argument, so this is not a case where a tattoo was referenced so fleetingly that harmlessness is clear. *See Newsom*, 452 F.3d at 602 (erroneously admitted evidence regarding a tattoo of a firearm was discussed only after a witness stated that she had never seen the defendant with a firearm, and then resulted in only "single response that she was not aware of any tattoos . . . depicting firearms," which was "so attenuated an exchange in the context of the overall trial"). But neither is this a case where the government otherwise had

---

[6]Casillas's tattoo depicting the Spanish phrase that translates to "I prefer to die standing than live kneeling," R. 1233 (Trial Tr. Vol. 2 at 370:22–371:3) (Page ID #14514–15), was also not linked specifically to membership in the Latin Kings. The government used the tattoo in its closing statement to constitute an admission by Casillas: "I think you guys can conclude David Casillas hates when people tell on him." R. 1274 (Trial Tr. Vol. 9 at 2031:4–6) (Page ID #17595). As with Rios's scale tattoo, this inference is relatively weak, although the prejudicial effect of admission of the tattoo is less clear. In any event, if admission of the tattoo was erroneous, it was harmless because it was at most tangentially related to the crimes with which Casillas was charged.

weak evidence on a specific factual point on which the tattoo could have pushed the jury over the line. *See, e.g.*, *Irvin*, 87 F.3d at 866 (erroneous admission of gang tattoo in non-conspiracy drug case was not harmless where the government had minimal other evidence from which a jury could infer that a defendant had possession of drugs and the tattoo served to link the defendant to a co-defendant, whose association with the drugs was clearer). Extensive evidence linked Rios directly to the Holland Latin Kings and their drug trafficking and racketeering operations and to specific criminal events, so it is difficult to say that admission of Rios's tattoo "contribute[d] to the verdict obtained" by inflaming the jury to find a link between Rios and guns and drugs. *Newsom*, 452 F.3d at 602 (quoting *United States v. Baldwin*, 418 F.3d 575, 582 (6th Cir. 2005)).[7]

### E. Evidence of Actions of Other Holland Latin Kings

Casillas objects to the introduction of evidence regarding racketeering acts committed by members of the Holland Latin Kings other than himself and Rios, on the grounds that this evidence was unfairly prejudicial. He filed a motion in limine on the matter before the district court, R. 830 (Casillas Mot. to Exclude Unrelated Acts at 2–4) (Page ID #5379–81), which denied the motion, R. 898 (Jan. 27, 2014 Opinion) (Page ID #6469–70), so we review the district court's Rule 403 analysis for abuse of discretion, *see Boyd*, 640 F.3d at 667.

On appeal, Casillas cites only two incidents that he claims were improperly admitted. The first citation is to the following portion of the government's opening statement: "In 2011 there was another attempt[ed] murder, this time of Devon Ruff. It does not involve Defendant Rios or Defendant Casillas, but this is another example of what happens when somebody steals drugs from the Latin Kings." R. 1232 (Trial Tr. Vol. 1 at 129:23–130:1) (Page ID #14271–72). The other incident cited by Casillas was a drive-by shooting conducted by Holland Latin Kings

---

[7]Casillas also appeals the denial of his request to ban the use of the word "gang" during the trial, arguing that the term was used to his detriment. He does not cite specific uses of the word during trial that he now claims were prejudicial. In any event, we find no abuse of discretion in the district court's decision. The general framework for the admission of gang-affiliation evidence applies to the analysis of the use of the term "gang" at trial. *See United States v. Brown*, 288 F. App'x 518, 523–24 (10th Cir.) (term should not have been used because "this is not a conspiracy case" and "there were no factual issues to be determined by the jury regarding defendant's connections to alleged gang members"), *cert. denied*, 555 U.S. 959 (2008). Under that rubric, use of the term "gang" to describe the Latin Kings and the Holland Latin Kings was appropriate as the existence of the enterprise and conspiracy was very much at issue. At a minimum, it was not an abuse of discretion to allow the term to be used.

during a time when the two Holland chapters of the Latin Kings were fighting each other. *See* R. 1233 (Trial Tr. Vol. 2 at 493:1–496:7) (Page ID #14637–40).

The government rightly maintains that a RICO conspiracy may be proven by utilizing the acts of others within the conspiracy. "Unlike a substantive RICO charge, a RICO conspiracy charge does not require proof that the defendant committed any predicate acts" and "does not even require proof that the defendant 'agreed to commit two predicate acts himself, or even that any overt acts have been committed.'" *United States v. Fowler*, 535 F.3d 408, 421 (6th Cir.) (quoting *United States v. Saadey*, 393 F.3d 669, 676 (6th Cir. 2005)), *cert. denied*, 555 U.S. 1060 (2008). In fact, the RICO conspiracy charge "merely requires proof that the defendant 'intended to further an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] criminal offense [and] it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.'" *Id.* (quoting *Saadey*, 393 F.3d at 676). The substantive RICO offense requires proof of "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity," *Salinas v. United States*, 522 U.S. 52, 62 (1997), and a "pattern of racketeering activity" will be found only upon proof of "at least two acts of racketeering activity," 18 U.S.C. § 1961(5).

Proof of the two incidents about which Casillas complains could therefore have sufficed to prove the necessary pattern of racketeering activity. The Devon Ruff assault was done by multiple Holland Latin Kings, after an attack order had been issued on Ruff by leadership of the Holland Latin Kings because Ruff had stolen marijuana from a Holland Latin Kings member. *See* R. 1271 (Trial Tr. Vol. 6 at 1418:19–1420:16) (Page ID #16976–78); R. 1272 (Trial Tr. Vol. 7 at 1573:21–1578:5, 1612:20–1613:25) (Page ID #17133–38, 17172–73). The drive-by shooting, similarly, was retaliation during a time when the West Side and East Side chapters of the Holland Latin Kings "were beefing back and forth." *See* R. 1233 (Trial Tr. Vol. 2 at 493:1–496:7) (Page ID #14637–40). The incidents were therefore probative of the existence and contours of the Holland Latin Kings enterprise and of specific racketeering acts committed in support of that enterprise. Nor did the evidence have a significant unfair prejudicial effect. Evidence is not unfairly prejudicial because its "legitimate probative force" hurts a defendant's case; rather, the question is whether the evidence "tends to suggest decision on an improper

basis." *Gibbs*, 182 F.3d at 429. To the extent that the evidence could inflame the jury against Latin Kings as a whole and thereby lead it to punish the defendants merely by virtue of their admitted membership in the Holland Latin Kings, that would be unfairly prejudicial, but many events involving equivalent violence were discussed during the trial, and Rios and Casillas were alleged to have been involved in those events in their capacity as members of the Holland Latin Kings. Thus, the addition of the two incidents cited by Casillas created minimal prejudice, and the district court did not abuse its discretion in admitting them.

## F. Evidence of Unindicted Acts by Casillas

Casillas next challenges the admission of evidence of what he claims were improper "bad acts evidence" under Federal Rule of Evidence 404(b) that also resulted in either a constructive amendment of or prejudicial variance from the indictment. He mentions three genres of evidence: (1) the story of a 1996 shooting; (2) the subsequent search of "a van that he was driving[,] and a statement that he made"; and (3) "his individual conduct while living in Texas." Casillas Appellant Br. at 37.[8] In advance of trial, Casillas filed a motion to exclude evidence of the same episodes. *See* R. 1126 (Casillas Mot. to Exclude Unindicted Propensity Evidence) (Page ID #12760–64). In response, the government contended that all of the challenged evidence was intrinsic to the racketeering conspiracy. *See* R. 1127 (Gov't Opp'n) (Page ID #12765–70). The district court denied Casillas's motion on the basis of the government's argument why the evidence was part of the conspiracy, but noted that the government "ha[s] the burden of pro[ving] that it's part of the conspiracy." R. 1537 (Tr. of May 16, 2014 Motion Hearing at 7:22–8:1) (Page ID #21312–13). The following evidence was introduced at trial:

*First*, the government introduced testimony from Desidario Amaro, a fellow Holland Latin King, who described an incident in which individuals at a house party attacked a neighbor who complained about the noise caused by the party, and who later turned out to be a member of a gang from Grand Rapids. *See* R. 1234 (Trial Tr. Vol. 3 at 729:22–730:5) (Page ID #14874–75). In retaliation, "[t]here was word that these guys from Grand Rapids were coming down to Holland to start a war with us," which led the Holland Latin Kings to organize at a house the

---

[8]Casillas challenges the admission a fourth type of evidence—that relating to a particular bar fight—but the government did not introduce evidence of the bar fight to which Casillas refers. *See* Appellee Br. at 77.

following night. *See id.* at 730:20–731:12 (Page ID #14875–76). The rival gang members showed up to that house "to start a fight with us, like they're coming to start a war with us, so people started shooting at them," *id.* at 731:21–23 (Page ID #14876), and Casillas fired a gun out of the house in the direction of the attackers, *see id.* at 679:4–680:20, 732:3–8 (Page ID #14824–25, 14877).

*Second*, the government introduced evidence regarding its investigation of that shooting. A detective encountered Casillas in a vehicle while on patrol the day after the shooting and pulled him over. *See id.* at 695:18–696:25, 697:9–21 (Page ID #14840–42). During a patdown, Casillas stated "[t]hose are my bullets" and the detective felt what seemed to be ammunition in a pocket of a jacket that Casillas was holding. *See id.* at 699:1–700:10 (Page ID #14844–45). Casillas then told the detective that he had been at the house at the time of the shooting, and "that at one point there were some black guys who had come up to the house and he was walking toward the front of the house when he suddenly heard what was like a pop-pop-pop sound." *Id.* at 701:10–702:1 (Page ID #14846–47). Casillas denied having fired a shot. *See id.* at 702:2–8 (Page ID #14847). Later, the van Casillas had been driving was searched pursuant to a warrant, officers found "a black bag which contained four handguns," *id.* at 703:19–704:6 (Page ID #14848–49), and Casillas took responsibility for "[e]verything in the van," *id.* at 717:14–24 (Page ID #14862).

*Third*, a significant amount of evidence was introduced regarding Casillas's activities in Texas. It is not clear from Casillas's brief what evidence he is objecting to (he refers to it as evidence of "his individual conduct while living in Texas," Casillas Appellant Br. at 37). A number of witnesses testified to a drug trafficking operation—headed by Casillas—that was based in Texas and served both to sell drugs to individual users in Texas and also to provide a way of buying drugs wholesale at much cheaper Texas prices and then shipping them to Holland for distribution. *See* R. 1233 (Trial Tr. Vol. 2 at 497:5–500:2) (Page ID #14641–44); R. 1235 (Trial Tr. Vol. 4 at 892:21–904:25) (Page ID #15039–51); R. 1271 (Trial Tr. Vol. 6 at 1421:11–1449:21) (Page ID #16979–17007).

**1. Rule 404(b)**

Casillas claims that admission of this evidence was improper under Federal Rule of Evidence 404(b)(1), which provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." "The Rule 404(b) inquiry consists of three parts":

> First, the trial court must make a preliminary determination as to whether sufficient evidence exists that the prior act occurred. Second, the district court must make a determination as to whether the 'other act' is admissible for a proper purpose under Rule 404(b). Third, the district court must determine whether the 'other acts' evidence is more prejudicial than probative under Rule 403.

*United States v. Mack*, 258 F.3d 548, 553 (6th Cir. 2001). This framework "is not implicated when evidence of prior acts is 'part of a continuing pattern of illegal activity' or is 'inextricably intertwined' with the indicted crime." *United States v. McGee*, 510 F. App'x 377, 381 (6th Cir. 2013) (quoting *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995)). The district court's determination that the evidence was admissible is reviewed for abuse of discretion. *See Mack*, 258 F.3d at 553.

The acts were each part of the crimes with which Casillas was charged. The analysis is clearest with the "Texas evidence," as Casillas was charged with conspiring to possess with the intent to distribute cocaine and marijuana during the time period in which the drug-related acts occurred. That evidence was directly probative of his guilt on the subject. The drug activity in Texas along with the 1996 shooting and its aftermath are similarly intrinsic to the charged racketeering conspiracy. Testimony suggested that the 1996 shooting incident began as part of a "war" between the Holland Latin Kings and a rival gang from Grand Rapids. *See* R. 1234 (Trial Tr. Vol. 3 at 729:22–731:23) (Page ID #14874–76). Casillas's Texas trafficking activities were also linked to the Holland Latin Kings, as numerous members participated and were given discounted prices and drugs were shipped by Casillas and others to be sold in Michigan. *See* R. 1235 (Trial Tr. Vol. 4 at 892:21–904:25) (Page ID #15039–51); R. 1271 (Trial Tr. Vol. 6 at 1421:11–1449:21) (Page ID #16979–17007). These acts, then, were properly admitted as evidence of actions taken in furtherance of the RICO conspiracy. *See United States v. Thai*, 29 F.3d 785, 812–13 (2d Cir.) (evidence of unindicted robberies committed by alleged members

of a RICO conspiracy that was charged with, among other things, a string of similar robberies was intrinsic to the RICO conspiracy charge as "acts in furtherance of the RICO conspiracy"), *cert. denied*, 513 U.S. 977 (1994).

### 2. Constructive Amendment and Variance

Casillas also claims that the same evidence worked a constructive amendment to the indictment or, at a minimum, constituted a prejudicial variance from the indictment. The district court denied Casillas's pretrial motion claiming that a variance or constructive amendment would occur upon admission of the challenged evidence, holding that the government nonetheless would have the burden of proving that the acts about which Casillas complained were in fact part of the conspiracy. *See* R. 1537 (Tr. of May 16, 2014 Hearing at 7:22–8:1) (Page ID #21312–13). We "evaluate[] claims of constructive amendments to or variances from an indictment *de novo*." *United States v. Kuehne*, 547 F.3d 667, 682 (6th Cir. 2008), *cert. denied*, 558 U.S. 928 (2009).

Constructive amendments and variances are related issues that stem from the Fifth Amendment's requirement that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. CONST. amend. V. "A constructive amendment 'results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which modify essential elements of the offense charged such that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment.'" *Kuehne*, 547 F.3d at 683 (quoting *United States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005)). "A variance 'occurs when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" *Id.* (quoting *United States v. Prince*, 214 F.3d 740, 756–57 (6th Cir. 2000)).

Casillas's arguments fail because the evidence he challenges is intrinsic to the RICO and drug conspiracy charges. That some of the specific actions were not listed in the indictment as additional overt acts in furtherance of the conspiracy or as other evidence of the existence of a conspiracy or RICO enterprise does not mean that their admission constituted an amendment or a

variance.   There is no requirement that a RICO conspiracy indictment allege *any* overt act, *Salinas*, 552 U.S. at 63, and even if proof of an overt act were required for conviction, it is a "well-established rule . . . that the overt act element of a conspiracy charge may be satisfied by an overt act that is not specified in the indictment, at least so long as there is no prejudice to the defendant," *United States v. Salmonese*, 352 F.3d 608, 619 (2d Cir. 2003).   In any event, the evidence was quite similar to the specific overt acts of racketeering that were alleged in the indictment.   It therefore neither created "a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment," as would be required for a finding that the indictment was constructively amended, *Kuehne*, 547 F.3d at 683 (quoting *Martinez*, 430 F.3d at 338), nor supplied proof of actions that were "materially different from those alleged in the indictment," as would be required for a finding that there was a variance, *id.* (quoting *Prince*, 214 F.3d at 756–57).

## G.  Rios's Motion to Suppress

Next, Rios contests the district court's denial of his pretrial motion to suppress evidence of the cocaine that was seized from his car on January 26, 2011.   We summarize the relevant facts:

In January 2011, Ralph Leal informed Detective Haglund "that Mr. Rios was trafficking narcotics within Holland city and that he would often make trips to Chicago or Detroit to obtain large amounts of cocaine and bring it back to Holland city and cut the cocaine up into larger amounts."   R. 918 (Tr. of Jan. 27, 2014 Motion Hearing at 7:18–8:7) (Page ID #6973–74). Ralph Leal later told Detective Haglund "that [Rios's then-girlfriend] Kandie Rodriguez just received a phone call from Antonio Rios and [Ralph Leal] overheard a conversation that took place between Mr. Rios and Ms. Rodriguez."   *Id.* at 10:12–19 (Page ID #6976).   The substance of the conversation was "that Mr. Rios would be picking her up at 11:00 on the 25th of January" from the house Rodriguez and Leal shared, and that they would be going to "get cocaine."   *Id.* at 11:19–12:12 (Page ID #6977–78).

Officers set up surveillance on the house and "observed Mr. Rios pick Ms. Rodriguez up from the residence."   *Id.* at 13:4–12 (Page ID #6979).   As Rios drove away, other officers

observed him "travel[ing] eastbound on 16th Street towards U.S. 31." *Id.* at 14:12–15 (Page ID #6980). Rios stopped at a gas station, at which point officers became concerned that Rios had noticed them. *See id.* at 14:16–15:4 (Page ID #6980–81). Officers therefore stopped tailing Rios, last seeing him traveling in the direction of the highway that one would take to get from Holland to either Detroit or Chicago. *See id.* at 15:12–24 (Page ID #6981). Having lost track of Rios, investigators sought and obtained a warrant for "[a]ll subscriber information and real time precision location information for" Rios's cell phone "for the next 2 days." R. 852-1 (Search Warrant Aff. ¶ 2) (Page ID #5657).

Upon receiving their "first ping back" regarding the cell phone's location, investigators learned that Rios was in Detroit. *See* R. 918 (Tr. of Jan. 27, 2014 Motion Hearing at 18:4–14) (Page ID #6984). They continued to monitor Rios's phone as it began to move back toward Holland the following morning. *See id.* at 21:24–23:3 (Page ID #6987–89). Investigators set up to intercept him and prepared a "K-9 unit" nearby. *Id.* at 23:4–11 (Page ID #6989). Rios was stopped after being observed speeding. *See* R. 852-1 (Police Incident Report) (Page ID # 5663). As soon as Rios was stopped, Haglund called the K-9 unit, R. 918 (Tr. of Jan. 27, 2014 Motion Hearing at 24:1–16) (Page ID #6990), which arrived between five and ten minutes later, *id.* at 42:10–23, 54:5–7 (Page ID #7008, 7020). The dog then quickly alerted on the tailgate of the car, *id.* at 54:16–21 (Page ID #7020), and officers found cocaine in a hidden compartment in the car's center console, *see id.* at 54:24–25, 57:13–25 (Page ID #7020, 7023).

Rios moved pretrial to suppress the cocaine. *See* R. 852 (Mot. to Suppress) (Page ID #5645–55). The district court held a hearing on the motion on January 27, 2014, at which Detective Haglund and the K-9 officer testified. *See* R. 918 (Tr. of Jan. 27, 2014 Hearing) (Page ID #6967–7034). The district court later denied Rios's motion to suppress. *See* R. 909 (Jan. 31, 2014 Opinion) (Page ID # 6825–35).

### 1. Search Warrant to Track Rios's Cell Phone

Although Rios jumps right to the analysis of whether the search warrant regarding his cell phone was supported by probable cause, he misses a key analytical step. We have already held that individuals do not have a reasonable expectation of privacy in the real-time location data

that their cellular telephones transmit, making it unnecessary to obtain a warrant to obtain such information. *United States v. Skinner*, 690 F.3d 772, 774, 777–80 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 2851 (2013). Rios does not attempt to distinguish this case from *Skinner*, so his argument fails before it starts.

### 2. Traffic Stop of Rios's Vehicle

Rios further argues that the cocaine seized from his car should be suppressed because officers had reason to stop his vehicle only for speeding, making the extension of the traffic stop to include a dog sniff unreasonable. A stop of a vehicle "constitutes a seizure within the meaning of the Fourth Amendment," and we "review[] the reasonableness of police conduct in effectuating a traffic stop under the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968)." *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012) (internal quotation marks omitted). "We first ask whether there was a proper basis for the stop." *Id.* (quoting *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)). "In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). "If the stop was proper, we ask 'whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances.'" *Stepp*, 680 F.3d at 661 (quoting *Davis*, 430 F.3d at 354). Thus, the Supreme Court recently held, "[a]uthority for" a stop occasioned solely by a traffic-related violation "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). This limitation does not apply when a dog sniff is prompted by reasonable suspicion of a separate crime. *See United States v. Bah*, 794 F.3d 617, 629 (6th Cir.) (distinguishing *Rodriguez* in a case where "officers had reasonable suspicion to continue [a traffic stop]" based upon information suggesting that other unlawful activity was afoot), *cert. denied*, 136 S. Ct. 561 (2015). Accordingly, if law enforcement in this case had reasonable suspicion separate from the traffic violation, the extension of the stop to conduct a dog sniff may well be justified.

The investigators here had such reasonable suspicion. Ralph Leal had provided specific information that Rios would be making a cocaine run, and a number of informants had

corroborated background information regarding Rios's involvement in drug trafficking. Those facts, along with the corroboration of Ralph Leal's specific tip—but for relatively minor details like whether he was going to Chicago or Detroit when he was said to have cocaine sources in both cities—provided "a particularized and objective basis for suspecting" that Rios's car was returning from Detroit with cocaine. *Lyons*, 687 F.3d at 763 (internal quotation marks omitted). Because the officers had reasonable suspicion of drug activity, the ten-minute delay between the beginning of the stop and the conclusion of the dog's sniff was reasonable in scope. Accordingly, Rios's motion to suppress was properly denied.

## H. Hearsay Objections

Rios and Casillas each moved pretrial to preclude the admission of "hearsay statements of alleged co-conspirators." R. 833 (Mot. to Preclude at 1) (Page ID #5391). In response, the government requested that the motion be held in abeyance because it "intends to make little or no use of the hearsay exception for co-conspirator statements." R. 888 (Gov't Opp'n at 1) (Page ID #6271). The district court held the motion in abeyance. *See* R. 911 (Jan. 31, 2014 Order) (Page ID #6837). On appeal, Casillas points to three times when he claims that hearsay was improperly admitted.[9]

### 1. Testimony of Agent Yandl

Special Agent Geoff Yandl testified about using a confidential informant to conduct a controlled buy of cocaine from Casillas. *See* R. 1273 (Trial Tr. Vol. 8 at 1902:10–1909:13) (Page ID #17564–71). Yandl first testified that he had "received information from a confidential informant that he could purchase powder cocaine . . . . from David Casillas" ("the First Statement"). *Id.* at 1903:9–17 (Page ID #17465). Agent Yandl then identified the informant as Rocky Solano and stated that after receiving the tip, he and Detective Haglund "met with Mr. Solano and had him place a phone call to Mr. Casillas." *Id.* at 1903:19–25 (Page ID #17465). Yandl was present during Solano's telephone conversation with Casillas, but could hear only

---

[9]Rios also objects to the admission of hearsay, but his brief contains only general statements about the trial. *See* Rios Appellant Br. at 52–54. Because Rios has not identified the testimony to which he objects, we analyze only the testimony cited by Casillas.

Solano's side of the conversation. *See id.* at 1904:1–7 (Page ID #17466). The government then inquired as follows ("the Second Statement"):

Q: Did you instruct Mr. Solano to ask to purchase a certain amount of cocaine?

A: Yes.

Q: All right. And did he in fact ask for that amount in his phone conversation?

A: Yes, he did.

*Id.* at 1906:17–22 (Page ID #17468).

Federal Rule of Evidence 801(c)(1) defines inadmissible hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." We have held that testimony describing a "tip" received by law enforcement is not offered for its truth when it serves to explain an officer's subsequent actions. *See United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir. 1990) (tip prompted officers to "look[] for a new, four-door yellow Cadillac on Ogden Street" and was therefore "not offered to prove the truth of the informant's remarks"; "[i]nstead, the officers' testimony regarding the tip was offered to show what they were looking for, and why"), *cert. denied*, 498 U.S. 1091 (1991). Under this authority, the First Statement, regarding Solano's tip that he could purchase cocaine from Casillas, explains why Yandl orchestrated the operation in the first place. The Second Statement, Solano's request that Casillas provide the amount of cocaine Yandl instructed him to ask for, provides background for Yandl's subsequent testimony about the particular amount of money he provided to Solano. *See* R. 1273 (Trial Tr. Vol. 7 at 1907:3–7) (Page ID #17469).

## 2. Testimony by Detective Haglund

Detective Haglund also testified to his use of confidential informant Rocky Solano, and specifically to an incident in which Solano contacted him about imminent violence between the Holland Latin Kings and a rival gang. *See* R. 1233 (Trial Tr. Vol. 2 at 389:15–391:16) (Page ID #14533–35). The questioning established that Haglund was on "speaker phone" with Solano, so that he could hear what was going on around Solano. *See id.* at 390:21–391:9 (Page ID #14534–35). Haglund testified as follows:

I heard discussion take place reference picking up a firearm. I heard several of the Latin Kings get shot at. I heard them running, and then I heard them get picked up and go to two different residences, and then I heard them driving in the vehicle with several other Latin Kings looking for rival gang members.

*Id.* at 391:11–16 (Page ID #14535).

Casillas's argument on appeal is that "[t]he government did not properly show that the co-conspirator's hearsay met the requirements for admissibility." Casillas Appellant Br. at 30–31. As the government contends, the evidence was not admitted as a co-conspirator statement. Instead, like the other evidence involving Solano, the brief statement that Solano called "to alert" Haglund to the imminent violence, without the introduction of any specific content of that statement, served merely to explain how Haglund happened to be on the line with Solano when shots rang out.[10]

## I. Jury Instructions

Rios and Casillas each challenge the district court's jury instruction regarding the reasonable-doubt standard and its denial of their request for a unanimity instruction regarding the racketeering acts that were needed to show a pattern of racketeering activity under 18 U.S.C. § 1962(c). "We review the jury charge as a whole to determine whether the charge fairly and adequately submits the issues and law to the jury." *United States v. Heath*, 525 F.3d 451, 455–56 (6th Cir. 2008). "'A trial court has broad discretion in crafting jury instructions and does not abuse its discretion unless the jury charge fails accurately to reflect the law,'" so we "review challenges to a district court's jury instruction for abuse of discretion." *United States v. Geisen*, 612 F.3d 471, 485 (6th Cir. 2010) (quoting *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007)), *cert. denied*, 563 U.S. 917 (2011).

---

[10]Casillas did not clearly challenge the admission of testimony from Mario Herrera regarding an incident in which a Holland Latin King shot at the home of a rival gang member. Casillas Appellant Br. at 30. Herrera learned about a shooting from conversations with other members of the Holland Latin Kings, and was asked at trial to give his "understanding of what happened." R. 1234 (Trial Tr. Vol. 3 at 540:1–541:16) (Page ID #14685–86). To the extent that Casillas challenges that testimony on appeal, we find that the statements were admissible as statements of a co-conspirator under Federal Rule of Evidence 801(d)(2)(E), which allows the admission of an otherwise-hearsay statement if: (1) "a conspiracy existed"; (2) "defendant was a member of the conspiracy"; and (3) "the declarant's statement was made during the course and in furtherance of the conspiracy." *United States v. Maliszewski*, 161 F.3d 992, 1007 (6th Cir. 1998), *cert. denied*, 525 U.S. 1184 (1999). Herrera—a leader within the Holland Latin Kings— was part of the alleged RICO conspiracy and the information he learned about the shooting came from other Holland Latin Kings and related to the Holland Latin Kings's conflict with a rival gang.

## 1. Reasonable-Doubt Instruction

Before the jury was instructed, Rios and Casillas objected to the district court's proposed reasonable-doubt instruction, and asked that the Sixth Circuit Pattern Instruction be given. *See* R. 1274 (Trial Tr. Vol. 9 at 1992:18–21, 1994:23–24) (Page ID #17556, 17558). That Instruction—which we have repeatedly approved, *United States v. Hynes*, 467 F.3d 951, 957 (6th Cir. 2006); *United States v. Stewart*, 306 F.3d 295, 306–07 (6th Cir. 2002), *cert. denied*, 537 U.S. 1138 (2003); *United States v. Goodlett*, 3 F.3d 976, 979–80 (6th Cir. 1993)—provides:

> The government must prove every element of the crime charged beyond a reasonable doubt. Proof beyond a reasonable doubt does not mean proof beyond all possible doubt. Possible doubts or doubts based purely on speculation are not reasonable doubts. A reasonable doubt is a doubt based on reason and common sense. It may arise from the evidence, the lack of evidence, or the nature of the evidence.
>
> Proof beyond a reasonable doubt means proof which is so convincing that you would not hesitate to rely and act on it in making the most important decisions in your own lives. If you are convinced that the government has proved the defendant guilty beyond a reasonable doubt, say so by returning a guilty verdict. If you are not convinced, say so by returning a not guilty verdict.

Sixth Circuit Pattern Jury Instruction ¶ 1.03. In response to Casillas's request that the Pattern Instruction be given, the district court stated:

> Well, the 1.03 is the standard reasonable doubt one, and there are some terms in it that I have quarreled with. First of all, the Court is not bound to give them word for word. I have colleagues throughout the circuit and throughout the United States that I've talked to and they just wholesale change them.
>
> This has one about the presumption of innocence and it talks about – where is it? Oh, proof beyond a reasonable doubt means proof that is so convincing you would not hesitate to rely on it or act on it in making, and the standard is the most important decision in your life. I guess I think that that's a rubric that makes no sense. What is the most important decision? Who I marry? What kind of a profession I go into? I mean, it doesn't have any sense to it. So what I think is a much more sensible definition is making an important decision in your own life. Everybody knows what that means.

R. 1274 (Trial Tr. Vol. 9 at 1993:16–1994:7) (Page ID #17557–58).

The district court instructed the jury with a reasonable-doubt instruction that tracked the Pattern Instruction almost entirely, with the sole difference being that the district court told the jury that "[p]roof beyond a reasonable doubt means proof which is so convincing that you would not hesitate to rely and act on it in making *an important decision* in your own life," *id.* at 2118:2–16 (Page ID #17682) (emphasis added), rather than the pattern instruction's "*the most important decisions* in your own lives," Sixth Circuit Pattern Jury Instruction ¶ 1.03 (emphasis added). Rios and Casillas argued that this reduced the government's burden of proof because proof that might not produce hesitation while making "an important" life decision might be shaky enough that one would hesitate if the decision were among "the most important" life decisions.

It is well-established that "[j]ury instructions concerning the presumption of innocence and proof beyond reasonable doubt are fundamental rights possessed by every citizen charged with a crime." *United States v. Hill*, 738 F.2d 152, 153 (6th Cir. 1984). This is so because "it is an elementary principle of due process that every element of the crime must be proven by the prosecution beyond a reasonable doubt." *Caldwell v. Bell*, 288 F.3d 838, 841 (6th Cir. 2002). Precisely how to instruct the jury regarding the reasonable-doubt standard is a matter of much dispute, however. Although it is mandatory that the jury be told that the prosecution's burden is to prove guilt beyond a reasonable doubt, *Jackson v. Virginia*, 443 U.S. 307, 320 n.14 (1979), "the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course," and also "does not require that any particular form of words be used in advising the jury of the government's burden of proof," *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). The constitutional question is not whether the burden would be lowered *at all*. A reasonable-doubt instruction will be problematic only if "there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." *Id.* at 6.

We cannot hold that there was such a likelihood here because the Supreme Court has approved of the use of language similar to that selected by the district court. *See Wilson v. United States*, 232 U.S. 563, 570 (1914) (instruction stated "if you are in the frame of mind where, if it was a matter of importance to you in your own affairs, away from here, you would

pause and hesitate before acting, then you have a reasonable doubt");[11] *Hopt v. Utah*, 120 U.S. 430, 439, 441 (1887) (approving language referring to "the more weighty and important matters relating to your own affairs" and calling such language "as just a guide to practical men as can well be given"). Indeed, in critiquing an instruction that was given by the trial court in *Holland v. United States*, 348 U.S. 121, 140 (1954), the Supreme Court specifically cited a D.C. Circuit decision that phrased the standard in terms of "matters of importance." *See Bishop v. United States*, 107 F.2d 297, 303 (D.C. Cir. 1939) ("[Reasonable doubt] is not a vague, speculative, imaginary something, but just such a doubt as would cause reasonable men to hesitate to act upon it in matters of importance to themselves.").[12] Although this guidance leads us to hold that the district court's instruction cannot be said to have created "a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard," *Victor*, 511 U.S. at 6, we stress that departures from pattern instructions regarding the reasonable-doubt standard tend only to muddy the waters further. "At worst such variations may be prejudicial to a defendant; at best they add needlessly to the work of appellate courts while being of no real benefit to the jury." *United States v. Ivic*, 700 F.2d 51, 69 (2d Cir. 1983), *abrogated on other grounds by Nat'l Org. for Women v. Scheidler*, 510 U.S. 249 (1994).

---

[11]Casillas argues that *Wilson* is not persuasive because it addressed a standard instructing the jury to find reasonable doubt if the evidence was such that jurors would *hesitate to act* in a matter of importance, while the district court in this case instructed the jury to convict if the evidence was such that jurors would *not hesitate to rely* on it when acting in a matter of importance. The standards, however, are mirror images: Acquit if you would hesitate; convict if you would not. The effect of using the phrase "an important" versus "one of the most important" therefore affects the government's burden in the same manner.

[12]Other Circuits have approved similar instructions. *See United States v. Shin*, 560 F. App'x 137, 140 (3d Cir.) (approving a Third Circuit model instruction, which defined reasonable doubt as "a doubt of the sort that would cause [an ordinary reasonable person] to hesitate to act in matters of importance in his or her own life"), *cert. denied*, 135 S. Ct. 244 (2014); *Baker v. Corcoran*, 220 F.3d 276, 292–93 (4th Cir. 2000) (approving an instruction that defined reasonable doubt as "requir[ing] such poof as would convince you of the truth of a fact to the extent that you would be willing to act upon such belief without reservation in an important matter in your own business or personal affairs," and later used the phrase "the more important matters of . . . life"), *cert. denied*, 531 U.S. 1193 (2001); *Vargas v. Keane*, 86 F.3d 1273, 1275, 1279–80 (2d Cir.) (approving an instruction that stated "using the same power of reasoning and power of thinking that would apply and do [sic] apply to weigh the importance of matters related to the [sic] important business affairs, if you then believe that each element of the crime submitted to you[] has been established beyond a reasonable doubt, you would be justified in finding the defendant guilty of that crime"), *cert. denied*, 519 U.S. 895 (1996).

## 2. Unanimity Instruction

At the close of trial, the defendants requested that the court give "a unanimity instruction on either the specific acts or categories for the RICO charge." R. 1274 (Trial Tr. Vol. 9 at 1992:25–1993:2) (Page ID #17556–57). The district court denied this request, and the defendants argue that a unanimity instruction was required because the jury was required to be unanimous as to the specific overt acts, or at least as to the specific categories of overt acts, they found to establish the RICO conspiracy. But "a jury need not agree on which overt act, among several, was the means by which a crime was committed." *United States v. Sanderson*, 966 F.2d 184, 187 (6th Cir. 1992). And the RICO conspiracy statute contains "no requirement of some overt act or specific act" at all. *Salinas*, 552 U.S. at 63. For that reason, we have suggested that "to convict a defendant of RICO conspiracy, the jury need not be unanimous as to the specific predicate acts that the defendant agreed someone would commit." *United States v. Wilson*, 579 F. App'x 338, 347 (6th Cir.), *cert. denied*, 135 S. Ct. 421 (2014); *see also, e.g., United States v. Cornell*, 780 F.3d 616, 625 (4th Cir.), *cert. denied*, 136 S. Ct. 127 (2015); *United States v. Randall*, 661 F.3d 1291, 1299 (10th Cir. 2011); *United States v. Applins*, 637 F.3d 59, 81–82 (2d Cir.), *cert. denied*, 132 S. Ct. 434 (2011). Accordingly, unanimity was not required as to the particular racketeering acts.

The defendants have a better argument regarding the need for unanimity regarding the specific categories of acts the RICO conspiracy involved. Many decisions have held that the jury must be unanimous "'as to the *types* of predicate racketeering acts' that someone would commit." *Wilson*, 579 F. App'x at 347 (quoting *Randall*, 661 F.3d at 1299). The Seventh Circuit disagrees, opining that the separate need to determine the scope of the conspiracy and for the racketeering acts to have been within that scope "determines type"—i.e. that a unanimous finding that a defendant joined a particular conspiracy that subsumed an agreement to commit particular types of racketeering acts is enough because, in joining, one agrees to the types of racketeering acts that may be committed in furtherance of the conspiracy. *United States v. Schiro*, 679 F.3d 521, 534 (7th Cir.), *cert. denied*, 133 S. Ct. 363 (2012). We need not resolve this disagreement, however, because the jury in this case unanimously found the racketeering conspiracy responsible for at least five kilograms of cocaine, R. 1197 (Verdict Form at 1–3)

(Page ID #1377–79), and thus necessarily was unanimous as to a type of racketeering act that the conspirators had agreed would be committed in furtherance of the conspiracy, making any instructional error harmless.

## II. ANALYSIS – SENTENCING ISSUES

### A. Standard of Review

"'[A]ppellate review of sentencing decisions is limited to determining whether they are reasonable,' and this reasonableness is reviewed 'under an abuse-of-discretion standard.'" *Penaloza*, 2016 WL 2755180, at *1 (quoting *Gall v. United States*, 552 U.S. 38, 46, 51 (2007)). "Sentences in criminal cases are reviewed for both procedural and substantive reasonableness," *id.* (quoting *United States v. Morgan*, 687 F.3d 688, 693 (6th Cir. 2012)), but Rios and Casillas raise only procedural challenges. Review for procedural reasonableness "requires that we 'ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence.'" *Id.* (quoting *Gall*, 552 U.S. at 51). "Undertaking this review, '[t]he district court's legal interpretation[s] of the Guidelines are reviewed de novo, but its factual findings will not be set aside unless they are clearly erroneous.'" *Id.* (quoting *United States v. Brooks*, 628 F.3d 791, 796 (6th Cir. 2011)).

### B. Antonio Rios

Rios's sentencing range was driven by his conviction on Count Fourteen, for conspiring to possess with the intent to distribute five kilograms or more of cocaine.[13] His Presentence

---

[13]Because Rios and Casillas were each convicted of multiple counts, the calculation of their sentences was based on the Multiple Count provisions of the Sentencing Guidelines. *See* U.S. SENTENCING GUIDELINES MANUAL ch. 3, pt. D (U.S. SENTENCING COMM'N 2014). "Those provisions provide that the district court must first group counts into 'Groups of Closely Related Counts' pursuant to U.S.S.G. § 3D1.2, then '[d]etermine the offense level applicable to each Group by applying the rules specified in § 3D1.3,' and finally '[d]etermine the combined level applicable to all Groups' under § 3D1.4." *Penaloza*, 2016 WL 2755180, at *2 n.1 (quoting U.S.S.G. § 3D1.1(a) (2013)); *accord* U.S.S.G. § 3D1.1(a) (2014). Rios's calculation was driven by his cocaine-conspiracy conviction because it had the highest Offense Level, and § 3D1.4 directs that "[t]he combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that offense level by the [multiple-count adjustment applicable to the other Groups]." The sentencing calculations for Casillas proceeded similarly.

Report held him responsible for at least 15 but less than 50 kilograms of cocaine, producing a Base Offense Level of 32.  *See* R. 1375 (PSR ¶ 1083) (Page ID #20711).  Rios was scored a two-level enhancement for possession of firearms pursuant to U.S.S.G. § 2D1.1(b)(1).  *See id.* ¶ 1084 (Page ID #20711).  He was scored another two-level enhancement for engaging in a pattern of criminal conduct as a livelihood under U.S.S.G. § 4B1.3.  *See id.* ¶ 1085 (Page ID #20712).  Finally, he was scored for another two-level enhancement for using or threatening violence, under U.S.S.G. § 2D1.1(b)(2).  *See id.* ¶ 1086 (Page ID #20712).  This left him with an Adjusted Offense Level of 38, which was increased by one level due to a multiple-count adjustment under U.S.S.G. § 3D1.1, driven by the alleged assault with intent to murder Darryl Patton.  *See id.* ¶¶ 1088–90 (Page ID #20712).  Rios was then scored a three-level leadership enhancement under U.S.S.G. § 3B1.1(b) and a two-level enhancement under U.S.S.G. § 3C1.1 for obstructing justice by attempting to bribe Bobby Leal.  *See id.* ¶¶ 1093–94 (Page ID #20712).  The PSR placed Rios in a Criminal History Category of IV, which produced a guidelines range of life in prison when combined with his Total Offense Level of 44.  *See id.* ¶¶ 1097, 1124, 1156 (Page ID #20713, 20721, 20725).

At sentencing, the district court overruled most of Rios's objections, but agreed with his objection to the criminal-livelihood enhancement.  *See* R. 1475 (Tr. of Nov. 14, 2014 Sentencing at 9:12–23, 10:22–11:9) (Page ID #21052–54).  This placed Rios at a Total Offense Level of 42. *See id.* at 29:21–23 (Page ID #21072).  Rios then argued for a downward variance, and the district court granted a six-level downward variance to an Offense Level of 36 (guidelines range of 292–365 months), and sentenced Rios to 300 months with "credit for the 61 months that you have served already in this matter."  *Id.* at 47:3–10 (Page ID #21090).  On appeal, Rios challenges the district court's:  (1) drug-quantity calculation; (2) application of a firearms enhancement; (3) application of an obstruction-of-justice enhancement; and (4) multiple-count grouping.

### 1. Drug Quantity

At sentencing, Rios objected to the quantity of drugs for which he was being held responsible, noting that the jury convicted him of involvement with only five kilograms.  *See id.* at 6:2–13 (Page ID #21049).  The district court overruled this objection, pointing to estimates

based upon the testimony of Mario Herrera, Desidario Amaro, and Frank Cisneros. *See id.* at 8:11–9:10 (Page ID #21051–52). "We review for clear error the district court's factual findings on drug quantity attributable to a defendant for sentencing purposes." *United States v. Darwich*, 337 F.3d 645, 663 (6th Cir. 2003). "When . . . the precise quantity of drugs involved is uncertain, the district court must 'err on the side of caution' and may only hold a defendant accountable for a specific quantity for which he is more likely than not actually responsible." *United States v. Johnson*, 732 F.3d 577, 581 (6th Cir. 2013) (quoting *United States v. Walton*, 908 F.2d 1289, 1301 (6th Cir. 1990)).

The fact that Rios's conviction was for an offense involving five kilograms or more of cocaine is not dispositive of this issue because there is no higher threshold to charge under the Controlled Substances Act, 21 U.S.C. § 841(b), even though the Sentencing Guidelines recognize multiple categories above five kilograms of cocaine, U.S.S.G. § 2D1.1(c) (2014). The jury's precise findings may be a starting point, but "[a] defendant is responsible for all drug quantities that are included within the scope of his 'relevant conduct.'" *United States v. Gill*, 348 F.3d 147, 149 (6th Cir. 2003).

The district court's finding that Rios was responsible for at least 15 kilograms was not clearly erroneous. Trial testimony from Desidario Amaro placed the Holland Latin Kings's annual cocaine trafficking involving Rios's Detroit source at approximately 18 kilograms over the course of several years. *See* R. 1271 (Trial Tr. Vol. 6 at 1508:21–1509:18) (Page ID #17066–67). Mario Herrera separately testified to Rios's involvement with some of the trips Herrera made bringing cocaine from Texas to Michigan, totaling roughly another kilogram. *See id.* at 1442:13–1445:10 (Page ID #17000–03). Finally, a proffer from Frank Cisneros included in Rios's Presentence Report made Rios responsible for cocaine coming from Chicago between 2008 and 2011. *See* R. 1375 (PSR ¶ 798) (Page ID #20670). Rios claims that some of the testimony regarding drug quantity came from the same witnesses who provided testimony regarding the marijuana conspiracy of which Rios was acquitted, so "it was more important than ever for the district court to be very careful in attributing specific quantity amounts to trial witnesses." Rios Appellant Br. at 56. Rios was convicted of the cocaine conspiracy based on some of that same testimony, however, and the mere fact that the jury might not have believed

beyond a reasonable doubt everything that the government's witnesses said is insufficient on its own to overturn the district court's credibility determinations at sentencing. *See United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008) ("We 'afford the district court's credibility determinations regarding witness testimony great deference.'" (quoting *United States v. Esteppe*, 483 F.3d 447, 452 (6th Cir. 2007))), *cert. denied*, 555 U.S. 1176 (2009).

### 2. Use of a Firearm

Rios did not object at sentencing to the application of a two-level enhancement under U.S.S.G. § 2D1.1(b)(1) (2014), but now argues that application of the enhancement was erroneous because the district court sustained an objection to the very same enhancement in Casillas's case. Ordinarily, "[a] district court's finding that a defendant possessed a firearm during a drug crime is a factual finding subject to the clearly erroneous standard of review." *Darwich*, 337 F.3d at 664 (quoting *United States v. Bartholomew*, 310 F.3d 912, 924 (6th Cir. 2002)). Where, as here, the defendant did not object to the enhancement before the district court, plain-error review applies, so Rios must "show (1) error (2) that 'was obvious or clear,' (3) that 'affected defendant's substantial rights' and (4) that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'" *Vonner*, 516 F.3d at 386 (quoting *Gardiner,* 463 F.3d at 459).

We discussed the legal framework applicable to the firearm enhancement in our Opinion regarding Rios's co-defendants:

> The firearm enhancement arises pursuant to U.S.S.G. § 2D1.1(b)(1), which provides that "[i]f a dangerous weapon (including a firearm) was possessed, increase by 2 levels." The guideline contains no explanation of when the firearm must have been "possessed" or by whom. Application Note 11 to § 2D1.1 states that "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense," and that Note has been interpreted to create a burden-shifting framework. "The government bears the burden of showing by a preponderance of the evidence that the defendant either 'actually or constructively possessed the weapon.'" *United States v. Darwich*, 337 F.3d 645, 665 (6th Cir. 2003) (quoting *United States v. Hough*, 276 F.3d 884, 894 (6th Cir. 2002)). Upon such proof, "a presumption arises that 'the weapon was connected to the offense,'" and "[t]he burden then shifts to the defendant to 'show that it was clearly improbable that the weapon was connected with the crime.'" *Id.* (quoting *Hough*, 276 F.3d at 894).

The first step has prompted some confusion over when or where the defendant must have "possessed the weapon." This confusion is the product of a 1991 amendment to the Sentencing Guidelines, which removed a prior requirement that the weapon was "possessed during the commission of the offense." *United States v. Faison*, 339 F.3d 518, 520 (6th Cir. 2003). After that amendment, we have interpreted § 2D1.1(b) to require that a firearm "was possessed" during anything that constitutes "relevant conduct" under U.S.S.G. § 1B1.3. *Id.*; *see also United States v. Clisby*, 636 F. App'x 243, 246–47 (6th Cir. 2016). Under the 2013 version of the Sentencing Guidelines . . . relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," as well as "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity," either of which must have "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." *Id.* § 1B1.3(a) (2013).[14] Once it is established that a firearm was possessed during relevant conduct, the presumption discussed in *Darwich* arises, subject to the defendant's ability to show that a connection to a drug offense was clearly improbable. *See Clisby*, 636 F. App'x at 247.

*Penaloza*, 2016 WL 2755180, at *6–7.

The government cites numerous instances when Rios possessed a weapon during the course of the 2006–2012 cocaine conspiracy. *See* R. 1375 (PSR ¶¶ 306–07, 310, 449–50, 478, 843, 1054–56, 1064–66, 1068–70, 1072–73) (Page ID # 20590–91, 20608–09, 20614, 20677, 20708–10). Because these events occurred during the course of the charged conspiracy, and were shown to have been related to the operation of the Holland Latin Kings, "a presumption arises that 'the weapon[s] w[ere] connected to the offense." *Darwich*, 337 F.3d at 665; *see also Penaloza*, 2016 WL 2755180, at *7 (evidence of firearms possession during the period of a marijuana conspiracy, combined with evidence linking the possession to protection of the overall Holland Latin Kings enterprise—which had drug trafficking as a main object—was sufficient to give rise to the *Darwich* presumption). Rios has not attempted to rebut that presumption, and the district court's finding that there was a lack of evidence connecting *Casillas's* possession of firearms to *Casillas's* offense does not do the trick. We therefore affirm the application of the firearms enhancement.

---

[14]The 2014 version applicable to Rios's sentencing is identical. *See* U.S.S.G. § 1B1.3(a) (2014).

### 3. Obstruction of Justice

At sentencing, Rios objected to the application of an obstruction-of-justice enhancement, which the PSR applied because Rios "offered to pay for [Robert] Leal's medical expenses in return for Mr. Leal's refusal to testify in the state court matter" arising out of the attack on Leal by Rios and other Holland Latin Kings at the Chanclazo Club in 2010. R. 1375 (PSR ¶ 1094) (Page ID #20712). Rios argued at sentencing that Leal "is so grossly incredible from start to finish, and of course Mr. Rios was acquitted of the assault." R. 1475 (Tr. of Nov. 14, 2014 Sentencing at 11:14–23) (Page ID #21054). The district court overruled the objection, finding Leal credible. *See id.* at 20:16–19 (Page ID #21063). "We review the district court's findings of fact for clear error, but determine de novo 'whether specific facts actually constitute an obstruction of justice.'" *United States v. Kamper*, 748 F.3d 728, 744 (6th Cir.) (quoting *United States v. Bazazpour*, 690 F.3d 796, 805 (6th Cir. 2012)), *cert. denied*, 135 S. Ct. 882 (2014).

The obstruction-of-justice enhancement applies "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1 (2014). We have found the enhancement appropriate upon evidence that a defendant sought to suppress witness testimony. *See United States v. Moss*, 9 F.3d 543, 554 (6th Cir. 1993) (individual testified "to the alleged solicitation of him by [the defendant] to bribe a witness").

Rios's argument is that because he was acquitted of assaulting Leal with the intent to murder him, Leal's testimony was rejected by the jury and the district court needed to "make a specific finding regarding Leal's general credibility that would support the enhancement." Rios Appellant Br. at 57. But Rios's acquittal was (1) under the reasonable-doubt standard (2) for assaulting Leal with the intent to kill him. That has little bearing on whether (1) under the preponderance-of-the-evidence standard (2) Rios sought to bribe Leal into not reporting the assault to the police. The district court did not clearly err in relying on Leal's testimony that he was severely beaten by Rios and other Holland Latin Kings in 2010, R. 1236 (Trial Tr. Vol. 5 at 1350:14–1359:15) (Page ID #15499–15508), and that he was contacted by Holland Latin Kings

after the attack, first by Mario Herrera, who offered Leal money not to go to the authorities, and then by Rios, who asked "if I needed anything, some money or whatever, he'd give me some money" and offered approximately $10,000, *id.* at 1362:7–1364:14 (Page ID #15511–13). This finding was also supported in part by Herrera's testimony at trial that Rios planned to "let [Leal] know to pay the hospital bills, help him out would be fine" in order to get Leal not to testify. *See* R. 1271 (Trial Tr. Vol. 6 at 1417:21–1418:1) (Page ID #16975–76).

### 4. Offense Grouping

Finally, Rios objected to the Presentence Report's treatment of the Darryl Patton assault as relevant conduct, although his attorney characterized it as one of many "non-scoring" objections. *See* R. 1475 (Tr. of Nov. 14, 2014 Sentencing at 22:21–23:12) (Page ID # 21065–66). The government agreed at sentencing that the objection did not affect the guidelines calculation, *id.* at 25:23–25 (Page ID #21068), and the district court found by a preponderance of the evidence that the Patton assault was an assault with intent to murder, *id.* at 26:21–24 (Page ID #21069). Rios now argues that, because he was acquitted of assaulting Patton with the intent to commit murder and the government did not offer additional proof at sentencing, the district court's finding that the assault occurred was erroneous. Rios recognizes that the Patton assault actually added one level to his Total Offense Level, under the procedures for grouping multiple counts of U.S.S.G. §§ 3D1.1–4 (2014). This is so because the Patton assault was scored as an assault with intent to commit murder under U.S.S.G. § 2A2.1(a)(2) (2014), causing the Adjusted Offense Level applicable to Count One—the racketeering conspiracy—to be 31. *See* R. 1375 (PSR ¶¶ 1072–74) (Page ID # 20710). This meant that, although Rios's sentencing calculation was driven by Count Fourteen, one level was added to that calculation as a multiple-count adjustment. *See id.* ¶¶ 1088–90 (Page ID #20712).

However appealing Rios's argument may seem, a RICO defendant who is acquitted of a specific racketeering act under a special sentencing allegation may nonetheless be sentenced based upon that very same act if the defendant is convicted of the overall RICO conspiracy. That is because the incident of which the defendant was acquitted may remain relevant conduct under U.S.S.G. § 1B1.3 (2014). "[I]n determining relevant conduct, a court may consider a broad range of information, including uncharged crimes, crimes where charges have been dismissed,

and crimes for which the defendant has been acquitted." *United States v. Redmond*, 667 F.3d 863, 875 (7th Cir. 2012). Thus, Rios's objection cannot rest solely on the fact of his acquittal.

The acquittal is not irrelevant, however, and it ties in to Rios's claim that the district court committed clear error in finding that Rios had assaulted Darryl Patton with the intent to commit murder. The district court's findings on this point were terse. Although it engaged in an extensive discussion with Rios's attorney regarding this and other assaults that were treated as relevant conduct, noted that the preponderance-of-the-evidence standard provided a very different circumstance for evaluating the evidence than the reasonable-doubt standard the jury applied, and reminded Rios's attorney that there "was sworn testimony" on the subject during the trial, its conclusion that the Patton assault was an assault with the intent to murder was vague: "I agree there is testimony on the record as to these, not only at trial, but there has been significant documentation that would suggest that these have been at least by a preponderance of evidence shown." R. 1475 (Tr. of Nov. 14, 2014 Sentencing at 26:21–24) (Page ID #21069). Nonetheless, "[e]ven if the district judge does not make detailed findings as to these supporting facts [regarding § 2A2.1], the Court of Appeals need not remand the case; we may look to the record to determine whether the district judge's decision was clear error." *United States v. Vaught*, 133 F. App'x 229, 233 (6th Cir. 2005).

We set forth the legal framework for the assault-with-intent-to-murder Guideline in our Opinion regarding the appeals of Rios's co-defendants:

> Section 2A2.1 of the Sentencing Guidelines provides for a Base Offense Level of: "(1) 33, if the object of the offense would have constituted first degree murder; or (2) 27, otherwise." U.S.S.G. § 2A2.1(a) (2013).[15]

> Application Note 1 to § 2A2.1 defines "first degree murder" by reference to 18 U.S.C. § 1111(a), which provides:

>> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a

---

[15]The 2014 version applicable to Rios's sentencing is identical. *See* U.S.S.G. § 2A2.1(a) (2014).

> pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.
>
> Any other murder is murder in the second degree.

*Penaloza*, 2016 WL 2755180, at *20. Both types of murder therefore require a finding that the individual acted "with malice aforethought," *see United States v. Conatser*, 514 F.3d 508, 523–24 (6th Cir. 2008); *United States v. Milton*, 27 F.3d 203, 206 (6th Cir. 1994), which we will find "when the defendant grossly deviates from the standard of care to such an extent that a jury could conclude that he must have been aware of a serious risk of death or serious bodily injury." *United States v. Snowden*, 602 F. App'x 294, 296–97 (6th Cir. 2015) (quoting *Conatser*, 514 F.3d at 523); *see also United States v. Morgan*, 687 F.3d 688, 697 (6th Cir. 2012) (describing the requirement as proof of "specific intent to kill"). The first-degree murder guideline—U.S.S.G. § 2A2.1(a)(1)—also requires "proof of premeditation and deliberation," *Penaloza*, 2016 WL 2755180, at *20 (quoting *United States v. Wilson*, 992 F.2d 156, 158 (8th Cir. 1993)), but premeditation is not required for the application of U.S.S.G. § 2A2.1(a)(2), *see United States v. Murillo*, 526 F. App'x 192, 195 (3d Cir. 2013) ("An offender commits or attempts second-degree murder if he acts with malice aforethought—the specific intent to kill—but not premeditation."). "We 'review the district court's factual findings supporting the attempted-murder Guideline under the clear-error standard of review.'" *Penaloza*, 2016 WL 2755180, at *20 (quoting *Morgan*, 687 F.3d at 696).

The incident was discussed extensively at trial. On November 21, 2009, Darryl Patton was at the S Nightclub. *See* R. 1235 (Trial Tr. Vol. 4 at 1024:5–17) (Page ID #15171). He had been drinking, but not so much that he could not remember what happened. *See id.* at 1024:22–1025:3 (Page ID #15171–72). Patton was involved in a fight with various members of the Holland Latin Kings in the club's parking lot. *See id.* at 1025:11–1026:1 (Page ID #15172–73). During the fight, he was stabbed in the chest, but could not identify his attacker. *See id.* at 1026:5–1027:19 (Page ID #15173–75). At the hospital, Patton was found to have a partially collapsed lung and a broken rib, which his treating physician testified could have been life-

threatening had the lung collapsed further. *See* R. 1236 (Trial Tr. Vol. 5 at 1069:21–1071:10) (Page ID #15218–20).

One of the club's bouncers testified that he had seen Rios fighting Patton and that Patton was stabbed immediately thereafter. *See* R. 1235 (Trial Tr. Vol. 4 at 1036:19–1038:13, 1039:22–1040:19) (Page ID #15183–87). Soon after the stabbing, other bouncers wrestled and detained a Latino man—ultimately identified by responding police as Rios—after he swung a knife at another bouncer. *See id.* at 1040:14–19, 1045:24–1048:4, 1050:8–1051:16 (Page ID #15187, 15192–95, 15197–98). Police who responded to the scene noticed that Rios had blood on his t-shirt and shoe; they interviewed Rios after reading him his *Miranda* rights, and Rios admitted to having been part of a fight. *See id.* at 1053:21–1057:11 (Page ID # 15200–05). The bouncer who had helped detain Rios informed a responding officer that Rios also had been "the one who had the knife." R. 1236 (Trial Tr. Vol. 5 at 1084:16–1085:22) (Page ID 15233–34). Finally, Mario Herrera testified that Rios later told him about the stabbing—including Rios's role in it—and explained that "the incident had escalated," beginning with someone having been disrespected. *See* R. 1271 (Trial Tr. Vol. 6 at 1412:18–1413:24) (Page ID #16970–71).

The testimony reveals a brutal assault with a knife and supports a finding that Rios was the one who stabbed Patton. Specific intent to kill may be inferred from Rios's decision to stab Patton in the chest in the midst of a fight. *See, e.g.*, *United States v. James*, 575 F. App'x 588, 596–97 (6th Cir. 2014) (specific intent to kill inferred from evidence that the defendant fired a gun while aiming at a particular individual); *Murillo*, 526 F. App'x at 195–96 (specific intent to kill could be inferred from the defendant's decision to fire a rifle "directly at a group of people" immediately after suffering "a vicious assault" by that group). At a minimum, it was not clearly erroneous to find that Rios acted with such intent.

## C. David Casillas

In his Presentence Report, Casillas's sentencing range was driven by his conviction on Count Fourteen, for conspiring to possess with the intent to distribute five kilograms or more of cocaine. The Presentence Report held him responsible for at least 15 but less than 50 kilograms of cocaine, producing a base offense level of 34 pursuant to U.S.S.G. § 2D1.1(c). *See* R. 1369

(PSR ¶ 1013) (Page ID #20488).  Casillas was scored a two-level enhancement for possession of a firearm pursuant to U.S.S.G. § 2D1.1(b)(1), *id.* ¶ 1014 (Page ID #20488), and another two-level enhancement for using violence, under U.S.S.G. § 2D1.1(b)(2), *see id.* ¶ 1015 (Page ID #20488).  Finally, Casillas was scored another two-level enhancement for engaging in a pattern of criminal conduct as a livelihood.  *See id.* ¶ 1016 (Page ID #20488).  This left him with an adjusted offense level of 40, which was increased by two levels due to a multiple-count adjustment under U.S.S.G. § 3D1.1.  *See id.* ¶¶ 1019–22 (Page ID #20489).  Casillas was then scored a four-level leadership enhancement under U.S.S.G. § 3B1.1(a).  *See id.* ¶ 1023 (Page ID #20489).  The PSR assessed Casillas a Criminal History Category of III, a Total Offense Level of 46, and a guidelines range of life in prison.  *See id.* ¶¶ 1027, 1048, 1095 (Page ID #20489, 20495, 20506).

At sentencing, the district court applied the two-level reduction of Amendment 782 to the Sentencing Guidelines, granted Casillas's objection to the two-level firearm enhancement, and granted in part Casillas's objection to the four-level leadership enhancement, holding that a two-level enhancement more appropriately fit Casillas's role.  *See* R. 1476 (Tr. of Nov. 14, 2014 Sentencing at 15:13–16:2, 29:4–30:10, 35:13–18) (Page ID #21109–10, 21123–24, 21129).  These decisions had the effect of lowering the Adjusted Offense Level for Count Fourteen to 36, which was lower than the 37 applicable to Count One—the RICO conspiracy.  For that reason, Count One ultimately drove the calculation of Casillas's sentence.  The racketeering conspiracy was scored at a Base Offense Level of 33 due to relevant conduct regarding the assault on Luis Olivares, which was scored as an assault with intent to murder under U.S.S.G. § 2A2.1(a)(1).  *See* R. 1369 (PSR ¶ 1003) (Page ID #20487).  Pursuant to U.S.S.G. § 2A2.1(b)(1)(A), a four-level enhancement was applied due to the permanent or life-threatening bodily injuries suffered by Olivares.  *Id.* ¶ 1004 (Page ID #20487).  That was then adjusted upward by two levels due to a multiple-count adjustment under U.S.S.G. § 3D1.1, *id.* ¶ 1019 (Page ID #20489), and two additional levels were added for a role enhancement under U.S.S.G. § 3B1.1.  This placed Casillas at a Total Offense Level of 41 with a range of 360 months to life.  *See* R. 1476 (Tr. of Nov. 14, 2014 Sentencing at 47:22–25) (Page ID #21141).  The district court sentenced him to 360 months, with "148 months" to "be subtracted" due to credit for prior state sentences "for Holland Latin King-related acts."  *Id.* at 65:18–5 (Page ID #21159).  On appeal, Casillas objects

to the district court's: (1) scoring of an assault with the intent to commit murder; (2) application of the criminal-livelihood enhancement; and (3) drug-quantity calculation. Because we affirm the district court on the first issue, we need not reach the latter two, which relate to the sentencing calculation for Count Fourteen and would therefore affect Casillas's sentence only if we were to reverse on the assault with the intent to commit murder.[16]

Casillas objected to the scoring of the assault on Luis Olivares as an assault with the intent to commit murder. *See id.* at 16:16–18:10 (Page ID #21110–12). The district court denied Casillas's objection to scoring the Olivares assault as an assault with intent to murder with the following findings:

> I think by a preponderance of the evidence one has to conclude that the nature of that beating under those circumstances could have and would have resulted in death had it continued because of the reckless disregard for the life of the individual on the ground.
>
> Now, that's almost as much as saying an intent to kill, certainly reckless disregard for the life of another person. I think it should stand. I think it should stand. Intent to murder is a flexible term, and I think there's sufficient testimony to let that stand.
>
> Now, it always has to be – very rarely does a murderer announce their intention to kill and how they're going to do it. That's just not the way things are done. So therefore, I think it should stand. I think it should stand. It's a close question. Obviously, everything's objected to in this case, so that will be able to be scrutinized as well. But I think the one individual who did give pretty clear testimony on it is entitled to certain deference as to what he heard when others didn't make any comment about it.

*Id.* at 24:8–25:2 (Page ID #21118–19). Casillas claims that these findings erroneously treated the enhancement as requiring only that he acted recklessly.

As discussed in Part II.B.4, *supra*, scoring of an assault with intent to commit murder is appropriate "if the object of the offense would have constituted first degree murder." U.S.S.G. § 2A2.1(a)(1) (2014). The guideline is applicable only upon "a finding of the specific intent to kill," *Morgan*, 687 F.3d at 697, and generally requires "proof of premeditation and deliberation,"

---

[16]Although Count Fourteen remained relevant to the calculation of a multiple-count adjustment that was applied, the same two-level multiple-count adjustment would still apply even if Casillas's two objections were granted.

*Wilson*, 992 F.2d at 158; *see also Christian*, 404 F. App'x at 993. "We review the district court's factual findings supporting the attempted-murder Guideline under the clear-error standard of review." *Morgan*, 687 F.3d at 696.

The district court did not clearly err when it found that Casillas had the intent to murder Olivares. Unlike the Patton assault discussed in connection with Rios's sentence, there was significant evidence of prior planning by Casillas. Testimony suggested that Rios was upset because Olivares had previously stolen cocaine from him. *See* R. 1235 (Trial Tr. Vol. 4 at 849:7–850:1) (Page ID #14996–97). Sometime later, Olivares was in a truck parked near Casillas's home, when Casillas "walk[ed] off toward the truck." *Id.* at 908:25–909:13 (Page ID #15055–56). By the time that Dusty Ray Howell—one of Casillas's drug-trafficking partners— could walk to the truck, "Louie [Olivares] was already unconscious" and "[h]is body was pretty much limp," but Casillas continued to "hit him a couple times through the window." *Id.* at 910:17–23 (Page ID #15057). Howell then "hit" Olivares a few times, and Casillas continued to kick Olivares. *Id.* at 911:1–6 (Page ID #15058). Howell heard Olivares "gargling on his own blood" and then Casillas said "[y]eah, motherfucker. Die, motherfucker." *Id.* at 911:8–9 (Page ID #15058). Although the beating stopped as others gathered around, *id.* at 911:11–16 (Page ID #15058), Olivares suffered life-threatening injuries that resulted in his being airlifted to a level-one trauma center. *See id.* at 877:2–880:11 (Page ID #15024–27).

Although another witness did not hear the statement "[d]ie, motherfucker," the district court's credibility determination regarding Howell was not clearly erroneous. Nor was it erroneous to combine that statement with the testimony as to how severely Olivares was beaten and the fact that he was beaten and kicked even after being "unconscious" and going "limp" to conclude Casillas intended to kill Olivares. Casillas's argument that the district court's findings confused a recklessness standard with the necessary intent to kill, misses the fact that although the district court seemed to discuss recklessness when describing the brutality of the assault, it later returned to a discussion of Howell's testimony regarding Casillas's statement "[d]ie, motherfucker." *Id.* at 24:8–25:2 (Page ID #21118–19). We therefore conclude that it was not clear error to apply the § 2A2.1 enhancement.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** Rios's conviction and sentence, and **AFFIRM** Casillas's conviction and sentence.